(No. 105582.–

EXELON CORPORATION, Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Appellees.

*Opinion filed February 20, 2009.—Modified upon denial of rehearing July 15, 2009.*

Barry Levenstam, Amy K. Trueblood, Amy D. Wills, and April A. Otterberg, of Jenner & Block LLP, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Thomas specially concurred, with opinion.

Justice Thomas also dissented upon denial of rehearing, with opinion.

Justice Burke took no part in the decision.

## OPINION

Plaintiff, Exelon Corporation, as successor to Unicom Corporation, filed a complaint in the circuit court of Cook County seeking administrative review of a decision by the Department of Revenue (Department). The Department denied plaintiff's claim for replacement tax investment credits provided by section 201(e) of the Illinois Income Tax Act (35 ILCS 5/201(e) (West 1994)). The circuit court confirmed the Department's decision, and the appellate court affirmed. 376 Ill. App. 3d 918. We allowed plaintiff's petition for leave to appeal (210 Ill. 2d R. 315(a)).

## I. BACKGROUND

The facts are undisputed. Commonwealth Edison (ComEd) was a wholly owned subsidiary of Unicom Corporation. During the years 1995 and 1996, ComEd was a public utility company principally engaged in the production, purchase, transmission, distribution and sale of electricity. During those years, ComEd bought nearly $3 billion in property that it used for generating, transmitting, and distributing electricity to its customers.

Unicom filed a combined 1995 and 1996 Illinois tax return. Unicom was liable for the "personal property tax replacement income tax" imposed by section 201(c) of

the Illinois Income Tax Act. See 35 ILCS 5/201(c) (West 1994). Unicom timely filed amended returns, in which it claimed investment credits against this tax liability provided by section 201(e) of the Income Tax Act. Section 201(e) provides a tax credit for investments in property used in Illinois by, among others, retailers. The section defines "retailing" as "the sale of tangible personal property or services rendered in conjunction with the sale of tangible consumer goods or commodities." See 35 ILCS 5/201(e) (West 1994). Unicom claimed a section 201(e) credit of $10,419,507 for 1995, and claimed a section 201(e) credit of $4,398,115 for 1996. The Department denied both claims.

Unicom filed an administrative protest and requested a hearing. The Department and Unicom filed cross-motions for summary judgment. The sole disputed point of law was whether Unicom was engaged in "retailing" as defined by section 201(e). The Department contended that Unicom was not engaged in retailing because it did not sell "tangible personal property," but rather sold electricity, which was intangible. Unicom contended that electricity was "tangible personal property" as required by the statute. Unicom attached to its motion an affidavit and report from its expert witness, Dr. Joel Fajans, a professor of physics at the University of California, Berkeley. Dr. Fajans opined that "as a matter of irrefutable scientific fact, electricity is physical and material" because it can be measured and stored, obeys physical laws, and "can be felt, tasted and seen."

Unicom further contended that the Department's denial of the section 201(e) credit violated the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2). Unicom claimed that it was the Department's policy to grant such tax credits to natural gas utility companies but not to electric utility companies. Unicom argued that there was no possible justification for

discriminating between natural gas and electric utilities based on the purposes and object of section 201(e).

The Administrative Law Judge (ALJ) recommended granting summary judgment in favor of the Department. The ALJ's written recommendation accepted the Department's arguments, which did not include any rebuttal of Dr. Fajans' expert opinion. Relying on this court's decision in *Farrand Coal Co. v. Halpin*, 10 Ill. 2d 507 (1957), the ALJ concluded that the General Assembly did not intend to include electricity within the meaning of "tangible personal property" when enacting section 201(e). Also, the ALJ accepted the Department's argument pertaining to the uniformity clause. The ALJ concluded: "[T]here is a real and substantial difference in the classes of persons to whom the credit is available, and that this difference is related to Illinois' longstanding [*sic*] public policy of treating differently, for tax purposes, persons who sell tangible personal property versus persons who do not." The Director of Revenue accepted the ALJ's recommendation.

Unicom filed a complaint for administrative review of the Department's decision. Exelon thereafter succeeded Unicom. The circuit court substituted Exelon for Unicom in the case caption, and confirmed the Department's decision.

The appellate court upheld the circuit court's confirmation of the Department's decision. 376 Ill. App. 3d 918. The appellate court viewed this court's *Farrand Coal* decision as dispositive of the case and concluded that it was "bound by the principle of *stare decisis* and must adhere to the decisions of our supreme court." 376 Ill. App. 3d at 922. The appellate court held that, as a matter of law, Exelon did not engage in the sale of "tangible personal property" as required by section 201(e) of the Income Tax Act. 376 Ill. App. 3d at 921-23. Also, the appellate court rejected Exelon's uniformity

clause challenge. 376 Ill. App. 3d at 923-27. Exelon appeals to this court.

## II. ANALYSIS

### A. Standard of Review

The Income Tax Act provides that judicial review of the Department's decisions be in accordance with the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1994)). 35 ILCS 5/1201 (West 1994). In a case arising under the Administrative Review Law, we review the decision of the administrative agency, not the determination of the circuit court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006).

The Administrative Review Law provides that judicial review extends to all questions of law and fact presented by the entire record. 735 ILCS 5/3—110 (West 1994). The proper standard of review depends on whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008); *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142 (2006). The Review Law limits judicial review to the administrative record; the court may not hear new or additional evidence. The statute additionally mandates that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3—110 (West 1994). Accordingly, when a court reviews an administrative agency's factual findings, it will not reweigh the evidence or substitute its judgment for that of the agency. Rather, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois*

*State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005); *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). In contrast, an agency's conclusion on a question of law is reviewed *de novo. American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998).

A mixed question of fact and law asks the legal effect of a given set of facts. *Cinkus*, 228 Ill. 2d at 211; *Comprehensive Community Solutions*, 216 Ill. 2d at 472. Mixed questions of fact and law are " 'questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' " *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577, quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982). An agency's conclusion on a mixed question of fact and law is reviewed for clear error. An administrative decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577-78.

Unlike *Pullman-Standard*, where the rule of law was undisputed, this case presents solely questions of law. The Department and the appellate court each considered itself bound by this court's tangential discussion of the physical properties of electricity in *Farrand Coal Co. v. Halpin*, 10 Ill. 2d 507 (1957). In determining whether and to what extent *Farrand Coal* controls the outcome of the present case, this court has the power and the duty to reexamine the authorities and legal concepts invoked in that opinion. See *Bradley v. Fox*, 7 Ill. 2d 106, 111

(1955). As will be explained, every aspect of our analysis involves construing section 201(e) of the Income Tax Act. This is a pure question of law and our review is *de novo.* See, *e.g., Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 214 (1994).

## B. The Merits

Before this court, Exelon contends that it qualifies for the section 201(e) tax credit because it falls within the terms of the statute. Exelon alternatively contends that denial of the section 201(e) tax credit violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2). It is quite established that this court will not address constitutional issues that are unnecessary for the disposition of the case. See, *e.g., In re E.H.*, 224 Ill. 2d 172, 178 (2006) (collecting cases). As the Department correctly observed in its motion for summary judgment and at oral argument before this court, if Exelon qualifies for the section 201(e) tax credit as a matter of statutory construction, then there is no reason to reach the alternative constitutional issue. See, *e.g., Mattis v. State Universities Retirement System*, 212 Ill. 2d 58, 74-75 (2004); *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 396 (1994).

### 1. *"Tangible* Personal Property"

To determine whether Exelon qualifies for the section 201(e) tax credit, we engage in a two-tier analysis. First, we analyze section 201(e) itself to determine the boundaries of the statute. Second, we determine whether section 201(e) applies in this particular case. See *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 201-02 (1989); *Zenith Electronics Corp. v. Department of Revenue*, 293 Ill. App. 3d 651, 654 (1997).

The fundamental rule of statutory construction is to give effect to the intention of the legislature. A court's analysis begins with the language of the statute, which is

the best indication of legislative intent. Where the statutory language is clear and unambiguous, the court must give it effect without resort to other tools of interpretation. In construing a statute, it is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 556 (1999); *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). Absent statutory definitions indicating a different legislative intent, words in a statute are to be given their ordinary and popularly understood meaning. To ascertain the ordinary and popular meaning of words, this court sometimes uses the dictionary as a resource. *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15 (1991); see *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 477-78 (1998). Construing a statute is a pure question of law and our review is *de novo*. *City of Belvidere*, 181 Ill. 2d at 205.

Section 201(c) of the Income Tax Act imposes a "personal property tax replacement income tax" on "the privilege of earning or receiving income" in Illinois. 35 ILCS 5/201(c) (West 1994). Section 201(e) provides a credit against the personal property replacement income tax for investments in "qualified property." 35 ILCS 5/201(e) (West 1994). The statute defines "qualified property," in pertinent part, as property "used in Illinois by a taxpayer who is primarily engaged in manufacturing, or in mining coal or fluorite, or in retailing." 35 ILCS 5/201(e)(2)(D) (West 1994). This section lastly provides: "For purposes of this subsection (e), the term 'retailing' means the sale of tangible personal property or services rendered in conjunction with the sale of tangible consumer goods or commodities." 35 ILCS 5/201(e)(3) (West 1994). The issue in this case is whether

electricity is "tangible personal property." If so, then Exelon's business of selling electricity constitutes "retailing" as defined by section 201(e), thereby qualifying Exelon for the tax credit. The Income Tax Act does not define the term "tangible personal property."

The Department and the appellate court considered this court's analysis in *Farrand Coal* to be dispositive of Exelon's claim for a section 201(e) tax credit. In *Farrand Coal*, this court considered the meaning of the phrase "tangible personal property" in the context of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1955, ch. 120, par. 440 *et seq.*). In the Retailers' Occupation Tax Act at that time, as in the Income Tax Act before us, the legislature used the word "tangible" to define the term "retail" without defining the word "tangible." Assuming that the words had their ordinary and popular meaning, this court referred to Webster's, which defined "tangible" as:

 " 'Capable of being touched; also, perceptible to the touch; tactile; palpable.' [Citation.]

 The same dictionary gives the law definition of the term 'tangible property' as 'Corporeal property either real or personal' and defines 'corporeal' as meaning 'Of the nature of, consisting of, or pertaining to, matter or a material body; physical; bodily; material;—opposed to spiritual or immaterial *** Tangible or palpable.' " (Emphases omitted.) *Farrand Coal*, 10 Ill. 2d at 511, quoting Webster's New International Dictionary (2d ed. 1946).

This court has adhered to this definition of "tangible." See *First National Bank of Springfield v. Department of Revenue*, 85 Ill. 2d 84, 88 (1981). Exelon agrees with the Department and the appellate court that this definition of "tangible" should be used in construing section 201(e).

However, Exelon contends that neither the Department nor the appellate court conducted the second tier of the analysis this court described in *Van's Material*, which applies the definition of "tangible" to the facts of this case. Rather, according to Exelon, the Department and

the appellate court relied on *Farrand Coal* in concluding, as a matter of law, that electricity is not tangible personal property. Indeed, the appellate court observed that it was "bound by the principle of *stare decisis* and must adhere to the decisions of our supreme court." 376 Ill. App. 3d at 922. Exelon assigns error to this conclusion. Exelon argues that *Farrand Coal* concerned the tangibility of coal, not electricity, and that this court's few comments regarding electricity were *dicta*.

*Obiter dictum* refers to a remark or expression of opinion that a court uttered as an aside, and is generally not binding authority or precedent within the *stare decisis* rule. *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993); *Department of Public Works & Buildings v. Butler Co.*, 13 Ill. 2d 537, 545 (1958). As more fully stated: "A dictum is 'any statement made by a court for use in argument, illustration, analogy or suggestion. It is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication.' " *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988), quoting *Stover v. Stover*, 60 Md. App. 470, 476, 483 A.2d 783, 786 (1984). There are several indications that a particular statement or passage in a prior opinion may be *dictum*:

> "One is that the passage was unnecessary to the outcome of the earlier case and therefore perhaps not as fully considered as it would have been if it were essential to the outcome. A closely related reason is that the passage was not an integral part of the earlier opinion—it can be sloughed off without damaging the analytical structure of the opinion, and so it was a redundant part of that opinion and, again, may not have been fully considered." *Crawley*, 837 F.2d at 292.

See *People v. Young*, 365 Ill. App. 3d 753, 770-71 (2006) (citing *Crawley*). In contrast, "an expression of opinion upon a point in a case argued by counsel *and deliberately passed upon by the court*, though not essential to the

disposition of the cause, if *dictum*, is a judicial *dictum*. [Citations.] And further, a judicial *dictum* is entitled to much weight, and should be followed unless found to be erroneous." (Emphasis added.) *Cates*, 156 Ill. 2d at 80. We agree with Exelon that this court's references to the tangibility of electricity in *Farrand Coal* were *obiter dicta*.

In *Farrand Coal*, the plaintiff coal company attempted to avoid paying sales tax imposed under the Retailers' Occupation Tax Act on the sale of coal to the city of Springfield, which operated an electric utility company. The coal company paid the sales tax under protest and sought to enjoin the Director of Revenue from collecting the payments. The circuit court dismissed the coal company's complaint, and the coal company appealed. *Farrand Coal*, 10 Ill. 2d at 507-08. The tax was payable on a sale of " 'tangible personal property to a purchaser, for use or consumption and not for resale in any form as tangible personal property.' " *Farrand Coal*, 10 Ill. 2d at 510, quoting Ill. Rev. Stat. 1955, ch. 120, par. 440. The coal company characterized its sale of coal as a sale for resale not subject to sales tax. It argued that what it actually sold was not the coal itself, but rather the "energy" stored in the coal, and that the electric utility bought the "energy" in the coal to convert it to electric "energy" and resell it. The coal company alleged "that the energy sold by the utility is the same energy it purchased, though changed in form into electrical energy; that the energy in the coal constitutes an ingredient or constituent or material of the electrical energy." *Farrand Coal*, 10 Ill. 2d at 508.

This court viewed the issue presented in *Farrand Coal* as follows:

"The basic issue to be resolved in determining this case is whether, under the act in question, *coal* is sold as tangible personal property to the utility for use or consumption and not for resale and is therefore the measure of a

taxable retail sale, or whether energy, as tangible personal property, is bought in the form of *coal*, extracted therefrom, processed and resold as tangible personal property in the form of electrical energy." (Emphases added.) *Farrand Coal*, 10 Ill. 2d at 509-10.

This court made clear that the coal company's *coal* was the focus of the case and not the electric company's electricity:

"It seems patently clear that plaintiff is engaged in the business of selling *coal* to utilities. Such *coal* constitutes tangible personal property within the popular meaning of that term as used in the act in question. The *coal* is used by the utility to generate electrical energy. Such use is by the burning or combustion of the *coal*. When burned, the *coal* is gone except for the ash residue. It is difficult to perceive how there could be a more complete use or consumption of the *coal* within the meaning of the act. Clearly plaintiff coal company has sold tangible personal property to the utility for use or consumption." (Emphases added.) *Farrand Coal*, 10 Ill. 2d at 513.

This was the dispositive reasoning of *Farrand Coal*. Indeed, affirming the circuit court, this court held: "*Coal* was sold as tangible personal property to the utility for use or consumption and not for resale within the meaning of the Retailers' Occupation Tax Act and is therefore the measure of a taxable retail sale." (Emphasis added.) *Farrand Coal*, 10 Ill. 2d at 513. In *Farrand Coal*, this court never had to—and never did—address definitively the issue of whether electricity is tangible.

The Department characterizes this view of *Farrand Coal* as "myopic." The Department argues that "whether electricity was tangible personal property was critical to the plaintiff's case." In *Farrand Coal*, the coal company included in its contention the following allegation and reasoning:

"that the energy purchased by the utility and also the electrical energy sold by the utility are both tangible personal property; that since the energy purchased by the

utility is tangible personal property and the same energy is resold by the utility to its customers, the energy is not used or consumed by the utility." *Farrand Coal*, 10 Ill. 2d at 508.

Therefore, according to the coal company, the sale of "energy" to the electric utility was not subject to sales tax. *Farrand Coal*, 10 Ill. 2d at 508-09.

The court in *Farrand Coal* rejected the coal company's arguments. The court observed:

"From the evidence it appears that although energy and mass are closely interrelated, indestructible, equivalent, interchangeable, directly proportional to and may be equated with each other, yet energy as such cannot be separated from mass or matter and stored, weighed, transported, handled, liquified, solidified, photographed, touched or otherwise perceived by the senses in its own right or capacity separate and apart from mass or matter. All witnesses who testified on the subject, including plaintiff's witnesses, agreed that energy cannot be separated from matter and tagged or otherwise physically identified in any way, cannot be located spatially, and does not have dimensions. In all these respects energy falls short of fitting into the ordinary and popularly understood meaning of the word 'tangible' as used by the General Assembly in the act in question." *Farrand Coal*, 10 Ill. 2d at 511.

This court then concluded its analysis by focusing on the consumption of coal and not the tangibility of electricity. *Farrand Coal*, 10 Ill. 2d at 513.

However, in a three-paragraph passage, this court also recounted several cases in support of its observation that the court had "at no time held electricity to be 'tangible' personal property." *Farrand Coal*, 10 Ill. 2d at 512. This passage was *obiter dicta*. Since this court rejected the coal company's argument that energy was "trapped" in the coal, the court had no need to—and did not—deliberately consider whether electricity is "tangible." The passage refers to *Peoples Gas Light & Coke Co. v. Ames*, 359 Ill. 152 (1934), in which this court

concluded that a "decision as to whether or not electricity was tangible personal property was expressly declined as unnecessary to a disposition of the case." *Farrand Coal*, 10 Ill. 2d at 512. This court specifically mentioned *People v. Menagas*, 367 Ill. 330 (1937), in which this court held that electricity was personal property and, therefore, could be the object of larceny under the Criminal Code. The State "conceded" that electricity was intangible (*Menagas*, 367 Ill. at 332-33), and the court so assumed (*Menagas*, 367 Ill. at 338). The acknowledgment of an assumption does not constitute a holding. See 20 Am. Jur. 2d *Courts* §134, at 517 (2005) (stating that "a case is not binding precedent on a point of law where the holding is only implicit or assumed in the decision but is not announced"). Lastly, the passage refers to *People ex rel. Mercer v. Wyanet Electric Light Co.*, 306 Ill. 377 (1922), in which this court held that "electric utility companies are neither manufacturing nor mercantile companies so as to have their capital stock assessed locally instead of by the State assessing authority." *Farrand Coal*, 10 Ill. 2d at 512. Indeed, this holding actually comports with our modern, common understanding of electric utility companies. An electric utility company is not a purely manufacturing or mercantile company. Rather, it belongs to that unique class of corporations known as public utilities. *Wyanet Light*, 306 Ill. at 380-81; see L. Hyman, A. Hyman & R. Hyman, America's Electric Utilities: Past, Present and Future 89 (7th ed. 2000) (explaining that an electricity supplier must perform the following functions to deliver the product: production, marketing, transmission, distribution, metering and billing, and retail supply).

We reject the argument that this court's discussion of electricity in *Farrand Coal* was beyond mere *obiter dicta*. The above-referenced language in *Farrand Coal* was overly broad and not necessary to its holding. This three-

paragraph passage was clearly unnecessary to the outcome of *Farrand Coal*. It was redundant in that it can be sloughed off without damaging the analytical structure of the opinion. See *Crawley*, 837 F.2d at 292. Further, the passage in *Farrand Coal* was not judicial *dictum*. Although this issue was briefed, this court did not deliberately rule upon the point. See *Cates*, 156 Ill. 2d at 80. Rather, the passage was uttered as an aside. See *Department of Public Works*, 13 Ill. 2d at 545.

Of course: "Even *obiter dictum* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court." *Cates*, 156 Ill. 2d at 80. Therefore, in this case, it was reasonable for the appellate court to consider itself bound by this court's discussion of the tangibility of electricity in *Farrand Coal*. 376 Ill. App. 3d at 922.

However, in construing legislation that lacks statutory definitions, this court cannot ignore the laws of physics as humanity has come to understand them. See, *e.g.*, *Marzullo v. Kahl*, 366 Md. 158, 191, 783 A.2d 169, 188 (2001) (observing that courts "do not set aside common experience and common sense when construing statutes").

In his recommended decision, the ALJ acknowledged that "neither party disputes the properties of electricity." The record in the present case contains the unrebutted affidavit and report of Dr. Fajans, entitled "The Physical Nature of Electricity." He defined electricity as the flow of electrons in a circuit. Dr. Fajans explained: "Electricity is physical and material because, microscopically, it consists of the flow and 'pressure' of a material entity, namely electrons, and macroscopically, it can be sensed (felt, tasted, seen, and heard), measured, weighed, and stored, and is subject to universal laws of nature." Dr. Fajans elaborated as follows:

"Without electrons, electricity cannot be transmitted. Though electrons themselves are very small and lightweight, they are one of the basic constituents of matter; common matter like hydrogen or ion consists of electrons, protons, and neutrons in roughly equal number. Recently, scientists have been able to see electrons, or more precisely, the density of electrons, with devices called Scanning Tunneling Microscopes. *** There is nothing more physical and material than an electron. Since electricity itself consists of the flow of a material object, electricity is physical and material."

Dr. Fajans further explained that electricity can be felt:

"You feel electricity every time you get a shock. Static shocks, from things like walking across a carpet on a dry day, are annoying, but almost always harmless. Electrical sensations from power lines range from the vibratory feeling that you may experience while gently running your fingertips over an improperly wired lamp, to the tingling feeling that you get if you touch the wires inside an electrical outlet with dry hands, to the strong twitch, pain and weakness you get from touching an outlet with wet hands, to extreme pain in more dangerous circumstances."

As a sister court observed: "The word 'intangible' from its Latin roots means something that cannot be touched or perceived by touch. [Webster's Third New International Dictionary 1173 (1993).] Electricity can be touched, and when a person does so and thereby completes an electrical circuit, it may be the last earthly sensation he or she feels." *Utilicorp United Inc. v. Director of Revenue*, 75 S.W.3d 725, 728 n.6 (Mo. 2001). Dr. Fajans' report reflects the currently understood electron theory of electricity. See, *e.g.*, L. Hyman, A. Hyman & R. Hyman, America's Electric Utilities: Past, Present and Future 15-19 (7th ed. 2000); see generally S. Gibilisco, Teach Yourself Electricity and Electronics 3 (4th ed. 2006) (explaining: "It is important to understand some simple general physics principles in order to have a full grasp of

electricity and electronics"); S. Herman, Delmar's Standard Textbook of Electricity (1993); D. Bodanis, Electric Universe: The Shocking True Story of Electricity (2005) (tracing understanding of electricity from mysterious force to flowing electrons).

This court's *dicta* in *Farrand Coal* regarding the tangibility of electricity was based on our scientific knowledge of over half a century ago and was skewed by the true issue presented in that case. Our current understanding of electricity has progressed beyond that time. We need not address the parties' alternative statutory construction arguments. We now join the several courts that have expressly held in varying contexts that electricity constitutes "tangible personal property." See, *e.g.*, *Searles Valley Minerals Operations, Inc. v. State Board of Equalization*, 160 Cal. App. 4th 514, 521, 72 Cal. Rptr. 3d 857, 862 (2008); *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 97-98 (R.I. 2006); *Davis v. Gulf Power Corp.*, 799 So. 2d 298, 300 (Fla. Dist. Ct. App. 2001); *Curry v. Alabama Power Co.*, 243 Ala. 53, 59-60, 8 So. 2d 521, 526 (1942).[1]

2. Is Exelon Primarily Engaged in "Retailing"?

The parties agree that if electricity is "tangible personal property," then Exelon would be engaged in "retailing" as defined by section 201(e). We have held that electricity is "tangible personal property" and, accordingly, hold that Exelon is a retailer as defined by sec-

---

[1]Our construction of "tangible personal property" in section 201(e) of the Income Tax Act is based on our current understanding of the tangibility of electricity. Of course, the General Assembly may define this term to include or exclude electricity as it chooses. Where the legislature defines a particular statutory term, a court is bound by the definition as long as it is reasonable. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 275 (1998).

tion 201(e). The second tier of the analysis described in *Van's Material* concerns whether Exelon satisfies the statutory requirements for a section 201(e) tax credit. See *Van's Material*, 131 Ill. 2d at 201-02. The parties chose to litigate Exelon's claim by means of cross-motions for summary judgment, by which they agree that no factual issues exist and that the case presents only the need to resolve the legal issue. See, *e.g.*, *Board of Trustees of Southern Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 210 (1994); *Allen v. Meyer*, 14 Ill. 2d 284, 292 (1958). Accordingly, our determination of that legal issue is conclusive.

In its petition for rehearing, the Department asks us to modify our opinion to render it only prospective to taxes incurred, or tax credits sought, for tax periods after the filing of this opinion. Generally, judicial decisions are given retroactive as well as prospective effect. *Deichmueller Construction Co. v. Industrial Comm'n*, 151 Ill. 2d 413, 416 (1992). However, this court has the inherent power to conclude that a decision will not apply retroactively, but only prospectively. *Deichmueller*, 151 Ill. 2d at 416; *Elg v. Whittington*, 119 Ill. 2d 344, 356-57 (1987). Whether a decision will be applied only prospectively will depend on whether: (1) the decision establishes a new principle of law, either by overruling past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) given its purpose or history, the decision's operation will be impeded or promoted by prospective or retroactive application; and (3) a balance of the equities mandates prospective application. *Bogseth v. Emmanuel*, 166 Ill. 2d 507, 515 (1995); *Deichmueller*, 151 Ill. 2d at 417-18; *Elg*, 119 Ill. 2d at 357. Considering these factors in light of the instant facts, we limit our holding to an entirely prospective application.

First, we are deciding an issue of first impression where the resolution was not clearly foreseen. Albeit in *obiter dicta*, the above-discussed language in *Farrand Coal* suggested that electricity was intangible.

Second, retroactive application of our decision is not necessary to advance its purpose. The purpose of our holding is to ensure that the default legal meaning of the statutory phrase "tangible personal property" corresponds to its popularly understood meaning. Prospective application promotes the purpose of our holding by allowing the General Assembly to declare expressly its intent to include electricity if it uses the phrase "tangible personal property" in the future. See 234 Ill. 2d at 284 n.1.

Third, a balance of the equities likewise favors rendering this decision entirely prospective. Retroactive application of this decision could cause uncertainty in state tax law in general and as applied to Exelon. Conversely, limiting this decision to an entirely prospective application permits the legislature to provide direction on the meaning of the statutory phrase "tangible personal property." Therefore, we hold that this decision will apply only prospectively to taxes incurred, or tax credits sought, for the tax year 2009 and thereafter. See, *e.g., Bogseth*, 166 Ill. 2d at 515-17; *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 529-30 (1993).

"It remains the mandate of this court that constitutional issues be considered only when the case may not be decided on nonconstitutional grounds." *Mulay v. Mulay*, 225 Ill. 2d 601, 611 (2007). Our disposition of this cause obviates the need to determine whether the Department violated the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2). See, *e.g., Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 185 (2003); *Bonaguro*, 158 Ill. 2d at 399.

## III. CONCLUSION

We disagree with the appellate court's conclusion that Exelon did not engage in the sale of "tangible personal property" for purposes of section 201(e) of the Income Tax Act. However, because our holding is to be applied prospectively only, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.

JUSTICE THOMAS, specially concurring:

My colleagues are firmly convinced that they have the science of this issue correct. Unfortunately, science does not answer the question before the court, and the majority has its history and its law wrong. Consequently, I cannot join its opinion.

Two fundamental misunderstandings underlie and inform the majority opinion. The first is the mistaken belief that the central question we must resolve is whether a majority of this court believes that electricity is tangible at the subatomic level and *not* whether the legislature intended to include electricity within the meaning of "tangible personal property" when it enacted the tax credit in question. The Department has correctly and persuasively argued that the legislature could not have so intended. The second is a misunderstanding of *Farrand Coal* so profound that the majority can cast aside as *obiter dicta* this court's discussion of an issue that was (a) central to the plaintiff's case; (b) litigated in the trial court; and (c) fully briefed and argued on appeal. I will demonstrate below that such a position is not only indefensible but directly contrary to this court's precedents. After demonstrating why *Farrand Coal*'s discussion of the tangibility of electricity was not *obiter*

*dicta*, I will set forth both why we should not abandon *Farrand Coal* and why the majority's reasons for doing so are wholly invalid.

## I. *OBITER DICTA*

### A. *Dicta* or Holding?

The majority correctly sets forth the distinction between *obiter dictum* and judicial *dictum*. In *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993), this court explained that *obiter dictum* is a "remark or expression of opinion that a court uttered as an aside, and is generally not binding authority or precedent within the *stare decicis* rule."[2] 234 Ill. 2d at 277. "On the other hand, an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum*." *Cates*, 156 Ill. 2d at 80. Because *obiter dicta* lies outside the *stare decisis* rule, the distinction between *obiter dicta* and judicial *dicta* is an important one. On the other hand, because judicial *dicta* has the force of a judicial determination and is entitled to much weight (*Cates*, 156 Ill. 2d at 80), the distinction between judicial *dicta* and a holding of the court is less important.

The majority, however, gives insufficient consideration to what discussions in opinions may not be considered *dicta* in the first place. A good summary appears in Corpus Juris Secundum:

"An adjudication on any point within the issues presented by a case is not dictum. This rule applies as to all

---

[2]The majority states that it agrees with Exelon that this court's references to the tangibility of electricity in *Farrand Coal* were *obiter dicta*. 234 Ill. 2d at 278. It should be noted, however that Exelon merely used the generic term *dicta* and did not state that the discussion was *obiter dicta*. The Department responded by arguing that the discussion was not *dicta*, but that, even if it was, it was judicial *dicta*.

pertinent questions, although they might be only incidentally involved, which are presented and decided in the regular course of the consideration of the case, and lead to the final conclusion, and to any statement in the opinion as to a matter on which the decision is predicated. Accordingly, a point expressly decided does not lose its value as a precedent because the disposition of the case is or might have been made on some other ground. Similarly, if a case presents two or more points, any one of which is determinative of the ultimate issue, but the court actually decides all of them, the case is an authoritative precedent on every point decided, and none of the points may be regarded as dictum. One point should not be denied authority merely because another point was more fully argued and considered, nor does a decision on one proposition make statements of the court regarding other propositions dicta." 21 C.J.S. Courts §229, at 227 (2006).

With these principles in mind, let us now turn to *Farrand Coal*'s discussion of the tangibility of electricity.

At issue in *Farrand Coal* was the desire of the plaintiff coal company not to pay the retailers' occupation tax. The coal company was being taxed on its sales of coal to an electric utility. The tax in question was imposed "upon persons engaged in the business of selling tangible personal property to purchasers for use or consumption." See *Farrand Coal*, 10 Ill. 2d at 510. The statute defined "sale at retail" as "any transfer of the ownership of, or title to, tangible personal property to a purchaser, for use or consumption *and not for resale in any form as tangible personal property.*" (Emphasis added.) Ill. Rev. Stat. 1955, ch. 120, par. 440. The statute further provided that, "Sales of tangible personal property, which property as an ingredient or constituent goes into and forms *a part of tangible personal property subsequently the subject of a 'sale at retail'*, are not sales at retail as defined in this Act." (Emphasis added.) Ill. Rev. Stat. 1955, ch. 120, par. 440. The position of the Department was that the coal company was selling

tangible personal property (coal) to the electric utility for use or consumption, and, consequently, it was required to pay the tax. The coal company argued that it was exempt from paying the tax under the statute's exception for tangible personal property resold by the purchaser. The coal company argued that the energy in the coal that it sold to the utility was resold by the utility as tangible personal property—electric energy. In its brief in *Farrand Coal*, the Department summarized what would be necessary for the coal company to prevail:

"For the plaintiff to prevail, it must be determined: First, that energy is tangible personal property; second, that electrical energy is merely a modified form of energy which can be proved to have been extracted from the coal, *and third that the transaction between the utility and its customers actually is a sale of electrical energy as tangible personal property* and not merely the selling of the work and service which the electrical energy can perform and furnish. Failure by the plaintiff to establish any one (not all, but any one) of these points will defeat the plaintiff's whole case and make a decision in the defendants' favor necessary." (Emphasis added.) *Farrand Coal*, defendant's brief at 61.

Consequently, both the plaintiff and the defendants presented extensive scientific testimony on the issues of whether energy and electricity are tangible personal property. The experts for the plaintiff included an associate professor of physics from Purdue University, a Ph.D. in physics in the institute for nuclear studies at the University of Chicago, a second physics professor from the University of Chicago, and the general superintendent for the utility, who was an engineering graduate from Purdue. The defense witnesses included a professor of physics from the University of Illinois and a professor of mining and metallurgical engineering from Washington University. *Farrand Coal*, 10 Ill. 2d at 509. The scientific testimony covered the better part of two full days. *Far-*

*rand Coal*, 10 Ill. 2d at 509. The plaintiff and the defendants disagreed as to whether: (1) electrical energy is merely energy in coal in a changed form; and (2) electricity is tangible personal property. *Farrand Coal*, 10 Ill. 2d at 509. The briefs cover in great detail the scientific testimony offered on whether energy and electricity are tangible personal property, and the parties presented extensive appellate arguments on these points.

It is not necessary, however, for one to have read the briefs in *Farrand Coal* to understand that this court's discussions of the tangibility of energy and electricity were not *dicta*. After all, *Farrand Coal* set forth the statute in question. See *Farrand Coal*, 10 Ill. 2d at 510. Moreover, it detailed the coal company's argument that the electric energy sold by the utility was tangible personal property. See *Farrand Coal*, 10 Ill. 2d at 508. It also set forth that the coal company's theory of the case was that "energy, as tangible personal property, is bought in the form of coal, extracted therefrom, processed and resold as tangible personal property in the form of electrical energy." *Farrand Coal*, 10 Ill. 2d at 509-10. Thus, it is apparent from the face of the decision that a showing that the electric utility was selling tangible personal property to its customers was essential to the coal company's claim and that the point was argued by the parties. Indeed, had the coal company not argued that the electric utility was selling tangible personal property to its customers, the Department would have been entitled to a judgment on that basis alone.

The *Farrand Coal* court ultimately addressed all parts of the parties' claims. The court agreed with the Department that the coal company sells tangible personal property (coal) to the utility and that the coal is used or consumed by the utility. *Farrand Coal*, 10 Ill. 2d at 513. The court rejected plaintiff's arguments that it is really selling energy in the coal and that the energy is resold as

electric energy by the utility. *Farrand Coal*, 10 Ill. 2d at 513. The court explained that (1) energy is intangible (and this holding would necessarily encompass electric energy) (*Farrand Coal*, 10 Ill. 2d at 511); (2) energy cannot be separated from matter (*Farrand Coal*, 10 Ill. 2d at 511); and (3) the electric utility is not selling tangible personal property to its customers (*Farrand Coal*, 10 Ill. 2d at 512-13).

Accordingly, there is no possible basis for casting aside this court's discussion of any of these issues as merely comments made "by the way" or as asides. Rather, they were points essential to the case, deliberately argued by counsel, and passed upon by the court. Every point that the court discussed in *Farrand Coal* was directly relevant to whether the exception for tangible personal property resold by the purchaser was applicable. Consequently, no part of the court's opinion may be considered *dicta*, even if any one of the points discussed could have alone supported the court's decision. 21 C.J.S. *Courts* §229, at 227 (2006); *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 93 L. Ed. 1524, 1526, 69 S. Ct. 1235, 1237 (1949).[3]

The majority supports its erroneous conclusion that this passage from *Farrand Coal* was *dicta* by selectively quoting from a Seventh Circuit opinion, *United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988). According to the

---

[3]The majority attempts to downplay the significance of the tangibility of electricity discussion by twice referring to it as a "three-paragraph passage." 234 Ill. 2d at 280, 281-82. It should be noted that this was the longest discussion in *Farrand Coal*. See *Farrand Coal*, 10 Ill. 2d at 510-13. Moreover, the majority neglects to mention that by focusing on these three paragraphs, it is leaving out: (1) the express holding that energy is intangible (*Farrand Coal*, 10 Ill. 2d at 511); and (2) the express holding that the sale of electrical energy by a utility is not a sale at retail of tangible personal property (*Farrand Coal*, 10 Ill. 2d at 513).

majority, the discussion of the tangibility of electricity was not "necessary" to the outcome of the case because it could be sloughed off without damaging the analytical structure of the opinion. 234 Ill. 2d at 281-82. There are several problems with this assertion. First, a fuller statement of the principle the majority is thinking of is that *dicta* is "an opinion expressed by a judge on a point not necessarily arising in the case, or a statement in an opinion *not responsive to any issue* and not necessary to the decision of the case." (Emphasis added.) 21 C.J.S. *Courts* §227, at 224-25 (2006). Second, far from supporting the majority's conclusion, *Crawley* shows why the majority's understanding of *dicta* is incorrect. In *Crawley*, the Seventh Circuit considered whether a prior opinion had changed the standard of proof in probation-revocation cases. The court had consistently held that the court could revoke probation if reasonably satisfied that the probationer had violated a condition of his probation. In one opinion, *United States v. Yancey*, 827 F.2d 83 (7th Cir. 1987), the court stated that the proof in the case satisfied the preponderance of the evidence standard. In subsequent cases, the court continued to apply the "reasonably satisfied standard." Rather than simply stating that the statement in *Yancey* was a mistake or that later decisions controlled, the court endeavored to demonstrate that *Yancey*'s statement was *dicta*. The court listed several definitions of the word *dicta*, including that *dicta* is " 'a statement *not addressed to the question before the court* or necessary for its decision.' " (Emphasis added.) *Crawley*, 837 F.2d at 292, quoting *American Family Mutual Insurance Co. v. Shannon*, 120 Wis. 2d 560, 565, 356 N.W.2d 175, 178 (1984). The court also stated that " '[t]he basic formula [for distinguishing holding from *dictum*] is to take account of facts treated by the judge as material and determine whether the contested opinion is based upon them.' " *Crawley*,

837 F.2d at 292, quoting *United Steelworkers of America, Local 8599 v. Board of Education of the Fontana Unified School District*, 162 Cal. App. 3d 823, 834, 209 Cal. Rptr. 16, 21 (1984). The court then stated that a different approach for identifying *dicta*, since the definitions are inconsistent, is to ask what is at stake in the definition. The court then adopted the following approach:

> "What is at stake in distinguishing holding from dictum is that a dictum is not authoritative. It is the part of an opinion that a later court, even if it is an inferior court, is free to reject. So instead of asking what the word 'dictum' means we can ask what reasons there are against a court's giving weight to a passage found in a previous opinion. There are many. One is that the passage was unnecessary to the outcome of the earlier case and therefore perhaps not as fully considered as it would have been if it were essential to the outcome. A closely related reason is that the passage was not an integral part of the earlier opinion—it can be sloughed off without damaging the analytical structure of the opinion, and so *it was a redundant part of that opinion* and, again, may not have been fully considered. *Still another reason is that the passage was not grounded in the facts of the case and the judges may therefore have lacked an adequate experiential basis for it; another, that the issue addressed in the passage was not presented as an issue, hence was not refined by the fires of adversary presentation.* All these are reasons for thinking that a particular passage was not a fully measured judicial pronouncement, that it was not likely to be relied on by readers, and indeed that it may not have been part of the decision that resolved the case or controversy on which the court's jurisdiction depended (if a federal court)." (Emphases added.) *Crawley*, 837 F.2d at 292-93.

The court ultimately concluded that *Yancey*'s statement about the preponderance standard was *dicta* because the issue of the proper standard *had not been raised in that case* and, since the evidence satisfied the higher preponderance standard, the court had no occasion to consider whether the defendant's probation

should have been revoked based on the lower "reasonably satisfied" standard. Thus, the court was dealing with a single sentence on an issue that had not been briefed or argued. What in the above discussion suggests that the Seventh Circuit would consider as *dicta* a discussion that was not only the longest discussion in an opinion but also addressed an issue that was (1) fully briefed by the parties (even more extensively than in the present case); (2) directly relevant to whether the statute applied; (3) essential to the plaintiff's case; and (4) the only part of the discussion that grounded the court's analysis in the court's precedents? The discussion to which the majority refers was *not* redundant and removing it absolutely would have damaged the analytical structure of the opinion. If we ignore for the moment the fact that "sloughing off" this analysis would *still* leave the holdings that energy is intangible and that electric utilities are not retailers of tangible personal property intact, without this analysis, none of the court's precedents would have been discussed. The court obviously considered it important to point out that the coal company's arguments had no support in this court's precedents and that all contrary out-of-state authority on the issue was distinguishable.

Moreover, the majority's view of what it means for something to be "necessary" for a court's decision would necessarily render vast amounts of supreme and appellate court case law mere *dicta*. According to the majority, the discussion of the tangibility of electricity or electrical energy was *dicta* because the court had already given another reason for holding that the statutory exception did not apply. 234 Ill. 2d at 282. But this would necessarily mean that in *every* case in which a court gives more than one reason for its holding, only the first reason would be a judicial determination and all other reasons

would be mere *dicta*. Not only is this not the law (see *Woods*, 337 U.S. at 537, 93 L. Ed. at 1526, 69 S. Ct. at 1237 ("where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*"); *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 68 L. Ed. 1110, 44 S. Ct. 621 (1924) (same); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 72 L. Ed. 303, 48 S. Ct. 194 (1928) (reason for court's conclusion is not *obiter dictum* merely because another reason was more fully argued and considered)), it is terrible as policy. The majority's position will mean that a court wishing to give several reasons for its holding will either have no incentive to do so or will not be able to list the reasons in the most logical sequence. Rather, the court will have to choose what reason it wants to be binding precedent and put that discussion first.

It appears that the majority might be confusing the analysis in *Farrand Coal* with the situation in which the resolution of one issue substantively precludes resolution of the other. Corpus Juris Secundum gives two examples of what it means for a court's discussion to be unnecessary to the decision:

> "For instance, once a court determines that a statute does not apply to a case, any statement concerning the statute's constitutionality is dictum. Similarly, when a court dismisses a case for lack of jurisdiction, any further discussion of the merits is dictum." 21 C.J.S. *Courts* §227, at 225 (2006).

This makes perfect sense. A court cannot rule on the constitutionality of a statute that is not before it, nor can the court rule on the merits of a case over which it lacks jurisdiction. But there is no reason why a court may not give several reasons why a statute does not apply to a case, and there is no "one and done" rule rendering every reason after the first one *obiter dicta*. The majority bases its *dicta* holding not on any legitimate substantive

reason, but simply on the manner in which Justice Bristow chose to structure his opinion.

In sum, there is no *dicta* in *Farrand Coal*. The court's opinion in that case is a concise, to-the-point analysis, giving several reasons why the statutory exception for tangible personal property resold by the purchaser does not apply. Every sentence in the court's opinion is directly relevant to that issue and is responsive to a point put in contention by the parties.

### B. Judicial *Dicta* or *Obiter Dicta?*

Even if we assume for the sake of argument that the court's discussion of the tangibility of electricity was *dicta*, for all of the reasons set forth above, it could only be judicial *dicta*. As this court explained in *People v. Williams*, 204 Ill. 2d 191, 206 (2003):

> "*Dicta* normally comes in two varieties: *obiter dicta* and judicial *dicta*. *Obiter dicta* are comments in a judicial opinion that are unnecessary to the disposition of the case. Black's Law Dictionary 1100 (7th ed. 1999). Judicial *dicta* are comments in a judicial opinion that are unnecessary to the disposition of the case, but involve an issue briefed and argued by the parties. Black's Law Dictionary 465 (7th ed. 1999)."

Or, as stated in *Cates*, the relevant question in determining whether dicta is *obiter dicta* or judicial *dicta* is to what extent the issue was before the court. *Cates*, 156 Ill. 2d at 81. The tangibility of electricity could not have been more central or relevant to the issue in *Farrand Coal*, and the issue was litigated in the trial court and briefed extensively on appeal.

The majority does not attempt to argue that this issue was not before the court in *Farrand Coal*. Instead, the majority seizes on the statement in *Cates* that judicial *dicta* is an expression of an opinion on a point argued by the parties and *deliberately passed upon* by the court, but not essential to the disposition of the case. *Cates*, 156

Ill. 2d at 80. The majority claims that the issue was not "deliberately passed upon," and therefore the discussion was not judicial *dicta*. To reiterate: in *Farrand Coal*, this court held that energy is intangible. *Farrand Coal*, 10 Ill. 2d at 511. This holding necessarily applies to electrical energy. The defendants in *Farrand Coal*, when arguing that electrical energy is intangible, incorporated by reference their arguments about energy in general, noting that "if energy is intangible, electric energy (which is just a form of energy) is necessarily intangible." *Farrand Coal*, defendants' brief at 35-36. The court then explained that any argument that electricity is tangible finds no support in this court's case law and all out-of-state opinions holding it to be tangible are distinguishable. *Farrand Coal*, 10 Ill. 2d at 512. The court summed up by holding that the sale of electrical energy by an electric utility is not a sale at retail of tangible personal property. *Farrand Coal*, 10 Ill. 2d at 513. So, according to the majority, holding that all energy is intangible, that any argument that electricity is tangible finds no support in this court's case law, that all out-of-state cases that hold electricity to be tangible are distinguishable, and that the sale of electrical energy is not a sale at retail of tangible personal property is not "deliberately passing" upon the question. Clearly, *obiter dicta* is now whatever this court wants it to be. Should it be any surprise that *no* court to consider *Farrand Coal* thought that this court was merely making comments as asides when it addressed this question? See *Waukegan Community Unit School District No. 60 v. City of Waukegan*, 95 Ill. 2d 244, 253 (1983) (citing *Farrand Coal* for the proposition that public utilities are in the business of rendering a service rather than in selling tangible personal property); 376 Ill. App. 3d at 921-23 (*Farrand Coal* classified electricity as intangible property); *Electric Energy, Inc. v. Hamer*, 373 Ill. App. 3d 733, 736 (2007) (citing *Farrand Coal* for

the proposition that "the sale of electricity is the sale of a service"); *Union Coal Co. v. Department of Revenue*, 38 Ill. App. 3d 293, 294 (1976) ("In the *Farrand* case the court held an electric utility company does not sell tangible personal property when it sells electricity or electrical energy"). Ironically, it appears that the majority believes that *Farrand Coal* passed upon the question too. The majority states that it was reasonable for the appellate court to consider itself bound by *Farrand Coal* (234 Ill. 2d at 282), but that we are now abandoning that case because our scientific understanding has progressed since that case was decided (234 Ill. 2d at 284). These statements make sense only if *Farrand Coal* did pass upon the question.

Because there is *no* legitimate debate as to whether this court's discussion of the tangibility of electricity was "an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court" (*Cates*, 156 Ill. 2d at 80), the majority opinion represents a clear and unequivocal repudiation of *Cates* and its progeny. Clearly, there is no longer a distinction in Illinois between judicial *dicta* and *obiter dicta*. Because the distinction that *Cates* drew is an important and valid one that has been applied by this court and other courts for years, I believe that any overruling of this precedent should be explicit and include a discussion of why it is appropriate to depart from *stare decisis*. *Cates* is too important and well established to be overruled *sub silentio*.

### C. What *Farrand Coal* Was Not About

Next, I must briefly point out what was *not* the issue in *Farrand Coal*. The majority notes that Exelon argues that *Farrand Coal* concerned the tangibility of coal, not electricity. 234 Ill. 2d at 276-77. Because the majority does not repudiate this obviously false statement, it is

unclear if this argument influenced the majority's erroneous conclusion that the discussion of the tangibility of electricity was *dicta*. *Of course* the issue in *Farrand Coal* was not whether coal is tangible. In the first place, who would argue that coal is *in*tangible? Such an assertion would be preposterous on its face and almost certainly would never be the focus of a supreme court opinion. In fact, such a position would be so absurd that even anyone who had never read *Farrand Coal* would have a pretty good idea that this could not have been the issue in that case.

Second, *why* would anyone have argued that coal is intangible? Such a position would have been fatal to both parties' cases. Both parties needed coal to be tangible for their arguments to succeed. The Department wanted to tax the plaintiff on the basis that its sale of coal was a sale of tangible personal property. In the coal company's effort to avoid paying this tax, it argued that its sale of tangible personal property was actually a sale of the energy in the coal. The coal company argued that if we start out with something tangible—coal—then whatever makes up the coal must also be tangible. Thus, the energy in the coal is tangible. *Farrand Coal*, plaintiff's brief at 25. The tangibility of coal was assumed and conceded by both parties as a necessary component of their respective positions, and the issue before the court was *not* whether coal is tangible. If this was indeed the true issue in *Farrand Coal*, it is interesting that it was never discussed in the opinion. See *Farrand Coal*, 10 Ill. 2d at 510-13.

Regardless of whether *Farrand Coal*'s discussion of the tangibility of electricity was a holding or judicial *dicta*, it is entitled to much weight and any departure therefrom requires a discussion of *stare decisis*. I will next discuss why compelling reasons exist not to depart from this court's precedents, following which I will

demonstrate that the majority's reasons for doing so cannot survive a moment's scrutiny.

## II. *STARE DECISIS*

The principles underlying *stare decisis* were well stated by Justice Freeman in his impassioned dissent in *People v. Mitchell*, 189 Ill. 2d 312 (2000):

"The term *stare decisis* is derived from the Latin phrase *stare decisis et non quieta moevre*, which translates ' "to stand by matters that have been decided and not to disturb what is tranquil." ' J. Wallace, *Stare Decisis and the Rehnquist Court: The Collision of Activism, Passivism and Politics in Casey*, 42 Buff. L. Rev. 187, 189 (1994), quoting Dictionary of Foreign Phrases and Abbreviations 187 (K. Guinach trans., 3d ed. 1983). This principle was engrafted in English jurisprudence, having been recognized by Sir William Blackstone, who acknowledged that ' "precedents and rules must be followed, unless flatly absurd or unjust." ' J. Stein, *The Hobgoblin Doctrine: Identifying 'Foolish' Consistency in the Law*, 29 Tex. Tech. L. Rev. 1017, 1019 (1998) quoting 1 W. Blackstone, Commentaries *70. In American jurisprudence, *stare decisis* reflects a ' "policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right.' " ' *State Oil Co. v. Khan*, 522 U.S. 3, 20, 139 L. Ed. 2d 199, 212-13, 118 S. Ct. 275, 284 (1997), quoting *Agostini v. Felton*, 521 U.S. 203, 235, 138 L. Ed. 2d 391, 422, 117 S. Ct. 1997, 2016 (1997), quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 76 L. Ed. 815, 823, 52 S. Ct. 443, 447 (1932) (Brandeis, J., dissenting, joined by Roberts and Cardozo, JJ.). As the United States Supreme Court has observed, the judiciary prefers this doctrine because it 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' *Payne v. Tennessee*, 501 U.S. 808, 827, 115 L. Ed. 2d 720, 737, 111 S. Ct. 2597, 2609 (1991).

This court, too, has voiced similar sentiments. Long ago

in *Prall v. Burckhartt*, the court observed that the rule of *stare decisis*

> 'is founded largely on considerations of expediency and sound principles of public policy, it being indispensable to the due administration of justice, especially by a court of last resort, that a question once deliberately examined and decided should be considered as settled and closed to further argument, and the courts are slow to interfere with the principle announced by the decision and it may be upheld even though they would decide otherwise were the question a new one.' *Prall v. Burckhartt*, 299 Ill. 19, 41 (1921).

In light of the foregoing, this court has recognized that the doctrine, while not inviolable, demands that it be overturned 'only on the showing of good cause.' *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 167 (1955)." *Mitchell*, 189 Ill. 2d at 363-64 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.).

Moreover, as both the United States Supreme Court and this court have explained, *stare decisis* considerations are at their apex in statutory construction cases. In *Neal v. United States*, 516 U.S. 284, 295-96, 133 L. Ed. 2d 709, 719-20, 116 S. Ct. 763, 769 (1996), the Supreme Court stated the following:

> "Our reluctance to overturn precedents derives in part from institutional concerns about the relationship of the Judiciary to Congress. One reason that we give great weight to *stare decisis* in the area of statutory construction is that 'Congress is free to change this Court's interpretation of its legislation.' *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). We have overruled our precedents when the intervening development of the law has 'removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies.' *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989) (citations omitted). Absent those changes or compelling evidence bearing on Congress' original intent, *NLRB v. Longshoremen*, 473 U.S. 61, 84 (1985), our system demands

*that we adhere to our prior interpretations of statutes. \*\*\* True, there may be little in logic to defend [the statutory construction] \*\*\*. Even so, Congress, not this Court, has the responsibility for revising its statutes. Were we to alter our statutory interpretations from case to case, Congress would have less reason to exercise its responsibility to correct statutes that are thought to be unwise or unfair."*

In *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 336 (1983), this court stated that "[c]onsiderations of *stare decisis* weigh more heavily in the area of statutory construction \*\*\* because such a departure \*\*\* amounts to an amendment of the statute itself rather than simply a change in the thinking of the judiciary with respect to common law concepts which are properly under its control."

This case presents a textbook example of when a court should follow *stare decisis*. As the Department explained in its brief:

"The transfer or sale of tangible personal property has been a term of art in Illinois tax law for seventy-five years. When the Illinois legislature passed the Retailers' Occupation Tax Act (ROTA) in 1933, it defined a retail sale as the 'transfer of the ownership of ... tangible personal property ... for use or consumption ... for a valuable consideration.' Laws 1933, p. 924 §1 (*presently codified, as amended*, at 35 ILCS 120/1 (2006)). This definition remains substantively unchanged. *Id.* When the legislature subsequently defined 'retailing' in the Investment Tax Credit as the sale of tangible personal property, it used an operative phrase that has been included in the definition of retailing for over seven decades, *compare* 35 ILCS 120/1 (2006) *with* 35 ILCS 5/201(e)(3) (2006), and which has an established legal meaning in Illinois tax law. *See, e.g., Schwak v. Zehnder*, 326 Ill. App. 3d 752, 756, 761 N.E.2d 192 (1st Dist. 2001) (holding that terms used in Investment Tax Credit had same meaning as same terms used in Use Tax and Retailers Occupation Tax Acts).

\* \* \*

In short, the tax treatment of electricity is a well-trod area of Illinois law. In a series of cases dating back decades

and extending to the present, this court and the Illinois Appellate Court have established that although electricity is property, it is not sold at retail as 'tangible personal property,' but rather provided as part of a service. Consequently, those who provide electricity services are not subject to taxes imposed on retailers and retail sales, nor are they entitled to credits and exemptions reserved for retailers. The appellate court correctly presumed 'that the legislature acted with knowledge of this prevailing case law' when it used the well-established definition of retailer in the Investment Tax Credit." Defendants' brief at 9-10, 14.

In addition to the fact that the Illinois courts' treatment of this issue has been consistent for decades, the Department also points out that we have clear evidence that the legislature knows that the courts have declared that electricity is not included within the term "tangible personal property" and that therefore electricity must be specifically mentioned if the legislature intends to include it. *Farrand Coal* was decided in 1957. In 1969, the legislature amended section 5 of the Public Utilities Revenue Act (Pub. Act 76—964, approved August 26, 1969 (now 35 ILCS 620/5 (West 2006))). This section incorporates portions of the Retailers' Occupation Tax Act into the Public Utilities Revenue Act. Because under *Peoples Gas Light & Coke Co.* and *Farrand Coal* electric utilities were not retailers as a matter of law, the legislature explained that "[r]eferences in such incorporated Sections of the Retailers' Occupation Tax Act to sales of tangible personal property mean the distributing of electricity *when used in this Act.*" (Emphasis added.) 35 ILCS 620/5 (West 2006). In contrast, when the legislature enacted the tax credit in question in 1982, the legislature simply used the term "tangible personal property" without any additional language incorporating electricity. See 35 ILCS 5/201(e) (West 2006). Consequently, we must presume that the legislature did not

intend for the term "tangible personal property" to include electricity when it enacted the investment tax credit.

Although the majority acknowledges that "[t]he fundamental rule of statutory construction is to give effect to the intention of the legislature" (234 Ill. 2d at 274), it never explains how it can possibly conclude, given interpretations of tax law dating back to the 1930s that electric utilities are engaged in the selling of a service and are not retailers of tangible personal property, and given the evidence we have that the legislature is aware of these interpretations and has acted in reliance on them, that the legislature intended to include electricity in the definition of "tangible personal property" in the statute in question.[4] The majority helpfully informs the legislature in a footnote (see 234 Ill. 2d at 284 n.1) that it may now define "tangible personal property" to include or exclude electricity as it chooses, but ignores the fact the legislature has *already* done this based on our previous definition. That is why it is now the proper role of the judiciary to stay out of the matter. See *Neal*, 516 U.S. at 295-96, 133 L. Ed. 2d at 719-20, 116 S. Ct. at 769. The trial court had it exactly right when it stated in its order: "If Exelon wishes to seek changes to the statute, it should take the matter up with the legislature."

In sum, given the Illinois courts' consistent holdings that electric utilities are not retailers of tangible personal property, and given the evidence that the legislature is aware of this case law and has acted in reliance on it, we should adhere to our precedent even if five members of this court now disagree with it and wish that those cases had been decided differently. The legislature already has

---

[4]This is the principal argument raised by the Department before this court, and the majority has chosen not even to acknowledge it, let alone address it.

its definition and it has been free to include electricity as it sees fit. This is a clear example of a situation in which it is more important that the law be settled than that it be settled right.[5] At one point in its opinion, the majority states that "in construing legislation that lacks statutory definitions, this court cannot ignore the laws of physics as humanity has come to understand them." 234 Ill. 2d at 282. I have not previously seen this canon of statutory construction, but, assuming that it is valid, is it not also true that, in construing statutes that lack statutory definitions, this court cannot ignore *its previous interpretations of those statutory terms as the legislature has come to understand them*? And if these are both valid considerations why would the latter not be of paramount importance to a reviewing court?

Let us now turn to the majority's reasons for abandoning *Farrand Coal*.

### III. THE MAJORITY'S NOT-SO-NEW SCIENCE

Although the majority does not acknowledge that it is bound by *stare decisis*, it does give reasons for abandoning this court's previous decisions. The majority has chosen to overturn decades of this court's precedents on the basis of the affidavit filed by Dr. Fajans. According to the majority, Dr. Fajans' affidavit reflects the "currently understood electron theory of electricity." 234 Ill. 2d at 283. The majority then cites three textbooks on electricity and explains that they trace the "understanding of electricity from mysterious force to flowing

---

[5]That this is a question that can ever be settled "right" is certainly debatable, as courts are still holding to this day that electricity is *not* tangible personal property. See, *e.g.*, *XO New York, Inc. v. Commissioner of Taxation & Finance*, 856 N.Y.S.2d 310, 51 A.D.3d 1154 (2008); *Omaha Public Power District v. Nebraska Department of Revenue*, 248 Neb. 518, 537 N.W.2d 312 (1995).

electrons." 234 Ill. 2d at 284. The majority also consults a Teach Yourself Electricity and Electronics textbook and cites it for the proposition that " '[i]t is important to understand some simple general physics principles in order to have a full grasp of electricity and electronics.' " 234 Ill. 2d at 283-84, quoting S. Gibilisco, Teach Yourself Electricity & Electronics 3 (4th ed. 2006). The majority then explains its belief that *Farrand Coal* was based on our "scientific knowledge of over half a century ago," and states that we should depart from that decision because "[o]ur current understanding of electricity has progressed beyond that time." 234 Ill. 2d at 284. The portions of Dr. Fajans' affidavit relied on by the majority are his statements that (1) electricity is made up of a material entity—electrons; (2) electricity can be felt, tasted, seen, heard, measured, weighed, and stored, and is subject to the laws of nature; and (3) electricity can be touched or felt because a person may receive a shock from electricity. 234 Ill. 2d at 282-83. In sum, the majority's reason for departing from our precedent is that this court's scientific understanding of electricity has progressed since *Farrand Coal* was decided in 1957, and that the points that we now understand that this court did not understand in 1957 are reflected in the highlighted portions of Dr. Fajans' affidavit. A brief history lesson is in order.

The electron in its present-day sense was discovered by the English physicist J.J. Thomson in 1897. 8 Collier's Encyclopedia 788 (1997). However, even before Thomson's discovery, Michael Farrady had discovered by 1833 that electricity was not a continuous fluid but was carried in discrete pieces. 8 Collier's Encyclopedia 787-88 (1997). Other important discoveries about electrons continued throughout the next few decades:

"The Bohr atom (1913) was the first attempt to describe the behavior of an electron in an atom. Louis Victor de

Broglie's idea (1924) on the wave nature of the electron (verified experimentally by Clinton Joseph Davisson and Lester Halbert Germer in 1927) was developed into wave mechanics by Erwin Schrodinger in 1926. Simultaneously, the spin of the electron was deduced by Samuel A. Goudsmit and George E. Uhlenbeck (1925) from various features of atomic spectra. The correct wave equation for the electron was given by Paul A.M. Dirac (1928). The Dirac equation is consistent with special relativity and correctly describes the electron's spin and magnetic moment (aside from radiative corrections)." 8 Collier's Encyclopedia 788 (1997).

The Dirac equation predicted the existence of positive electrons, or positrons, and positrons were found in cosmic rays by Carl D. Anderson in 1932. 8 Collier's Encyclopedia 788 (1997).

Shortly after these discoveries, the question of the tangibility of electricity began to be litigated in Illinois courtrooms and elsewhere. In 1934, Time magazine reported on the trial court proceedings that would form the basis for this court's decision in *Peoples Gas Light & Coke Co. v. Ames*, 359 Ill. 152 (1934):

"In his Chicago courtroom last week Circuit Judge Harry M. Fisher stared at a voltmeter which had been placed before him on the bench. The voltmeter was connected to a switch, and the switch was connected with the courtroom lights. When the switch was closed Judge Fisher saw the voltmeter needle leap from 0 to 110 on the dial. What he had to decide was whether the thing that made the needle leap was tangible or intangible. There to help him, but arguing on opposite sides of the dispute, were two distinguished Nobel Prizemen.

Point at issue was whether electric current was subject to Illinois 2% Occupation tax. Twenty power companies headed by Commonwealth Edison, Peoples Gas Light & Coke, and Central Illinois Public Service contended that current was an intangible, hence nontaxable. The State contended that current was a tangible and taxable commodity. The companies stood to lose in taxes, the State to gain in revenue, some $5,000,000 annually.

No one attacked the orthodox teaching of physics that electric current is a flow of matter having mass. A current of one ampere is a flow of 6,281 billion billion electrons per second past a given point. An electron is a particle of matter weighing 0.8999 billionths of a billionth of a billionth of a gram. But was electric current tangible?

Up rose beetle-browed Dr. Arthur Holly Compton (Nobel Prize, physics, 1927). Electricity was tangible, said he, because it could be seen, heard, felt, tasted.

Up rose wiry, tousle-haired Dr. Irving Langmuir (Nobel Prize, chemistry, 1932). Electricity was intangible, said he, because it could not be seen, heard, felt, tasted.

Circuit Judge Fisher watched, listened, pondered. Then, he solemnly pronounced electricity a tangible, taxable commodity." *Electricity in Court*, Time (July 30, 1934).

When the case ultimately reached the supreme court, this court decided that it did not have to determine whether or not electricity was tangible because public utilities are in the business of rendering a service. *Peoples Gas Light & Coke Co.*, 359 Ill. at 158-61. The Retailers' Occupation Tax Act was intended to apply only to those who are in the business of selling tangible personal property for use or consumption, and utilities are in the business of rendering a service. *Peoples Gas Light & Coke Co.*, 359 Ill. at 158.

In *People v. Menagas*, 367 Ill. 330 (1937), this court considered whether a theft of electric current was covered by the larceny statute. The court received testimony from an electrical engineer who explained that electricity is the motion of electrons, and that an electron is the smallest unit of matter reasonably and accurately known to science. *Menagas*, 367 Ill. at 331. This court held that, although electrical energy is intangible, it can be measured, stored, and carried off. *Menagas*, 367 Ill. at 333. The court ultimately decided that the relevant test for whether something could be the subject of a larceny was whether it could be taken and carried away. Because

electrical energy fell within this test, it was covered by the larceny statute, even though it was intangible. *Menagas*, 367 Ill. at 338.[6] The court further explained that this holding was in no way inconsistent with cases such as *Peoples Gas Light & Coke Co.*, which had held that, for purposes of tax statutes, utilities are engaged in service rather than selling. *Menagas*, 367 Ill. at 338.[7]

In 1942, the Supreme Court of Alabama took up the question of whether electricity is tangible personal property. In *Curry v. Alabama Power Co.*, 243 Ala. 53, 8 So. 2d 521 (1942), the issue was whether the power company was required to pay taxes under the Alabama Use Tax Act. Resolving this issue required the court to consider whether electricity is tangible personal property. Expert testimony was received on this question, and typical of the testimony was that of Dr. K.B. McEachron, who explained that electricity is a flow of electrons, that electricity has mass or weight, that it may be perceived by the senses in that it may be tasted, felt, and touched. *Curry*, 243 Ala. at 56, 8 So. 2d at 522-23. Ultimately, the court determined that it did not have to decide the issue

---

[6]The *Menagas* court twice referred to electrical energy as intangible and never stated that it was simply "assuming" it to be so, and the record before the court contained expert testimony explaining that electricity is the flow of a material entity— electrons. However, even if this was just an assumption, that hardly seems problematic in light of *Farrand Coal's express holding* that energy is intangible.

[7]This court's categorization of electricity as intangible for purposes of theft statutes would remain just as consistent as our categorization of electricity as intangible for purposes of tax statutes. In 2007, this court, in discussing the reach of the theft statute, stated that "the legislature intended to expand the definition of property to include *not only* items of tangible personal property *but also* other things of value such as real estate, *electricity*, and telecommunications services." (Emphases added.) *People v. Perry*, 224 Ill. 2d 312, 328 (2007).

because the legislature had defined electricity as tangible personal property within the meaning of the Use Tax Act. *Curry*, 243 Ala. at 60, 8 So. 2d at 526. Nevertheless, the court decided to weigh in on the question and determined that electricity is tangible.[8] The court determined that the meaning of tangible, according to Webster's, is " 'capable of being touched, also perceptible to the touch, palpable.' " *Curry*, 243 Ala. at 59, 8 So. 2d at 526. The court determined that electricity fit this definition of "tangible" because electricity is made up of electrons, and electrons have mass or weight. Moreover, electricity can be tasted, smelled, and touched. In fact, a sufficient charge could tear a hole in a person's body. *Curry*, 243 Ala. at 60, 8 So. 2d at 526. This decision was cited and discussed in the parties' briefs in *Farrand Coal*.

In 1957, this court decided *Farrand Coal*. As noted earlier, the briefs in that case contain page after page of scientific argument on the tangibility of electricity. The plaintiff argued, *inter alia*, that electricity can be touched, as when a person receives an electric shock. Moreover, it was perceptible to other senses in that it could be seen and tasted. Further, energy is tangible because it is measurable, real, objective, and corporeal. *Farrand Coal*, plaintiff's brief at 22. Electricity can also be measured and weighed, and it is carried to the customer though a wire by the use of electrons. *Farrand Coal*, plaintiff's brief at 23. The plaintiff discussed *Curry*, and noted that it held that electricity was tangible

---

[8]The Supreme Court of Alabama's discussion of this issue is what had been—until today—characterized as judicial *dicta*: the resolution of an issue presented by the parties but not necessary for the disposition. In this instance, however, the majority does not recharacterize it as *obiter dicta* and brush it aside. Rather, it describes it as an express holding of the court, which the majority chooses to join. 234 Ill. 2d at 284.

because it was made up of electrons and was perceptible to the senses. *Farrand Coal*, plaintiff's brief at 29-30.

In response, the defendants reviewed the scientific testimony and argued that the plaintiff's witnesses were not convincing because they viewed almost everything as tangible and the defendants did not believe that the legislature meant to speak so broadly when it used the term "tangible personal property" in the Retailers' Occupation Tax Act. *Farrand Coal*, defendants' brief at 16. The defendants agreed that "tangible" means "capable of being touched," or "perceptible to the touch," but did not believe that the commonly understood meanings of those terms included energy. *Farrand Coal*, defendants' brief at 11, 16. Moreover, the defendants argued that, although the *effects* of electricity could be felt, that is not the same thing as saying that electricity can be touched. *Farrand Coal*, defendants' brief at 41. The defendants also acknowledged that they were not arguing that electricity was not tangible in any possible sense, and that it may be accurate to describe it as tangible in the sense that everything that exists is tangible. However, the defendants did not believe that the legislature intended to use such a far-fetched meaning of "tangible" in the Act in question. *Farrand Coal*, defendants' brief at 43-44. Moreover, the defendants explained that this court's previous holding that electric utilities were engaged in a service business rather than in retailing tangible personal property were well-taken because the only possible tangible things in electricity would be the electrons, but those are not purchased by the customer. Rather, the electrons flow from the utility, through the customer's appliances, and then back to the utility through a return wire. Thus, the customer is not purchasing electrons, but is purchasing the work that the electrons do. *Farrand Coal*, defendants' brief at 44. The defendants acknowledged that *Curry* had based its

decision that electricity is tangible on the basis of electrons, but argued that this was misleading because the electrons are not delivered to the customer by the utility. Rather, the customer pays for and receives the benefit of electric current (a service). *Farrand Coal*, defendants' brief at 45. When a customer plugs in his or her electric coffee pot, the customer gets hot coffee. The customer does not come into possession of whatever caused the coffee to become hot. *Farrand Coal*, defendants' brief at 49-50. The defendants also explained that Illinois cases holding that electric utilities sell a service really disposed of the whole case because, if the utility is not selling tangible personal property to its customers, then it cannot be *reselling* tangible personal property derived from coal or any other source. *Farrand Coal*, defendants' brief at 49.

This court agreed with the parties that the definition of "tangible" is " '[c]apable of being touched; also, perceptible to the touch; tactile; palpable.' " *Farrand Coal*, 10 Ill. 2d at 511, quoting Webster's New International Dictionary (2d ed. 1946). The court, however, expressly declined to wade into the minutiae of the scientific testimony and declare who was right. Rather, the court stated that "[t]he true criterion on which the decision of this case must turn is not what meaning the respective witnesses may attach to such phrase, but what was the intention and meaning of the General Assembly in using such phrase in the statute in question." *Farrand Coal*, 10 Ill. 2d at 510. The court decreed that energy fell short of "fitting into the ordinary and popularly understood meaning of the word 'tangible' as used by the General Assembly."[9] *Farrand Coal*, 10 Ill. 2d

---

[9]Exelon claims that the court was only speaking about the energy in coal in this portion of the opinion, but the opinion does not state this. Moreover, the defendants in *Farrand Coal*, when

at 511. Thus, the court seemed to accept the defendants' argument that, although energy may be tangible in the sense that everything that exists is tangible, it did not believe that the legislature intended to speak so broadly. Just as importantly, however, the court grounded its decision in this court's precedents. The court noted that it had already held in *Peoples Gas Light & Coke Co.* that electric utilities are engaged in a service business and are not subject to the Retailers' Occupation Tax. *Farrand Coal*, 10 Ill. 2d at 512. Moreover, although this court had held in *Menagas* that electrical energy was personal property in that it could be the subject of larceny, the court in that case twice referred to electrical energy as intangible. *Farrand Coal*, 10 Ill. 2d at 512. Finally, the court acknowledged that other courts had held electricity to be tangible personal property, but distinguished those cases on the basis that they either involved statutes declaring electricity to be such or were based on holdings that electric utility companies are engaged in manufacturing commodities. This was contrary to this court's holding in *People ex rel. Mercer v. Wyanet Electric Light Co.*, 306 Ill. 377 (1922), which held that electric utilities are neither manufacturing nor mercantile companies. *Farrand Coal*, 10 Ill. 2d at 512.

Several things should be apparent to the reader at this point. First, the highlighted points in Dr. Fajans' affidavit are not at all new, and, in fact, predate *Farrand Coal*. We are *not* departing from *Farrand Coal* because that case was based on our scientific understanding of over half a century ago and our scientific understanding

---

arguing that electric energy is intangible, incorporated by reference their arguments about energy in general, noting that "if energy is intangible, electric energy (which is just a form of energy) is necessarily intangible." *Farrand Coal*, defendants' brief at 35-36.

has progressed beyond that time. 234 Ill. 2d at 284. Rather, we are overthrowing 75 years of consistent, established precedent for no other reason than that Exelon went out and hired an expert to testify to the exact same things that experts have been testifying to since the 1930s. Although the majority claims that our scientific understanding has progressed since 1957, the Supreme Court of Alabama had reached the same point for the same reasons in 1942.

Second, the irrelevance of the majority's citation to three electricity texts with the parenthetical "tracing understanding of electricity from mysterious force to flowing electrons" should now be apparent. This is *not* something that has happened since 1957. It is not the case that the *Farrand Coal* court was in a benighted state of scientific understanding, believing that electricity was a mysterious force, but the present court understands that electricity is a flow of electrons. Rather, the *Farrand Coal* court understood perfectly well that electricity is a flow of electrons. Moreover, as Time magazine reported in 1934, in the trial court proceedings that led to this court's decision in *Peoples Gas Light & Coke Co.*,

> "[n]o one attacked the orthodox teaching of physics that electric current is a flow of matter having mass. A current of one ampere is a flow of 6,281 billion billion electrons per second past a given point. An electron is a particle of matter weighing 0.8999 billionths of a billionth of a billionth of a gram." *Electricity in Court*, Time (July 30, 1934).

Similarly irrelevant is the majority's citation to Teach Yourself Electricity and Electronics for the proposition that one must understand general physics principles to grasp electricity and electronics, as the majority never identifies any principles of physics that the *Farrand Coal* court was unable to grasp. Indeed, it is the majority's inability to grasp that *Farrand Coal* was not based on *any* theory of electricity that makes it unable to see that its

entire opinion rests on an invalid premise. Third, the reader will note that Dr. Fajans' points about electricity being perceptible to the senses and that a person can receive a shock from electricity are equally as stale and long predate *Farrand Coal*.

The only thing in Dr. Fajans' affidavit that the majority points to that postdates *Farrand Coal* would be his assertion that scientists have recently been able to see the density of electrons with scanning tunneling microscopes.[10] The scanning tunneling microscope was developed in 1981. See http://en.wikipedia.org/wiki/Scanning_tunneling_microscope (last visited December 5, 2008). But surely the majority does not believe that this is any reason to overturn *Farrand Coal*. First, this was not an advancement in electrical theory. The scanning tunneling microscope merely allowed scientists to get a better look at what they already knew was there. Second, this court's previous decisions holding that electric utilities render service instead of retailing tangible personal property are *not* based on any disbelief in the electron or the density of electrons. The scanning tunneling microscope might be relevant if this court had stated that until someone could prove that electrons have density, we would classify electricity as intangible, but this court never said or implied any such thing. Finally, let us examine where the majority's scanning tunneling microscope point takes us in terms of legislative intent. Would any member of today's majority be willing to step forward and make the following argument? When the legislature enacted the tax credit in question in 1982, it was aware that this court had held that electric utilities are not retailers of tangible personal property. The legislature, however, wanted this tax credit to be avail-

---

[10]In its brief, Exelon does not rely on this portion of Dr. Fajans' affidavit.

able to electric utilities. The legislature considered simply defining tangible personal property as including electricity, as it had done in section 5 of the Public Utilities Revenue Act. But then someone pointed out that, just the previous year, the scanning tunneling microscope had been invented. Realizing that scientists would use this to see the density of electrons, the legislature concluded that the Illinois Supreme Court would change its mind about the tangibility of electricity, and therefore the legislature could simply use the undefined term "tangible personal property" and wait for this court to overrule *Farrand Coal*. Unless the majority is willing to make this extravagant argument, I think it will have to concede that the invention of the scanning tunneling microscope in 1981 does not offer any insight into whether the legislature intended this tax credit to be available to electric utilities.

Fourth, when the majority states that *Farrand Coal* was based on our scientific understanding of over half a century ago, the majority fails to contemplate the extent to which *Farrand Coal* declined to weigh in on the battle of scientific experts in that case. Thus, as soon as one begins searching for the answers to the legal questions raised in this appeal in Teach Yourself Electricity and Electronics or Electric Universe: The Shocking True Story of Electricity, that person has missed entirely the point of *Farrand Coal*. The experts gave extensive, detailed arguments in *Farrand Coal*, and the parties expounded on these points at great length in their briefs. But, as the Department pointed out, this court expressly *declined* to declare if any particular expert was right and simply said that "[t]he true criterion on which the decision of this case must turn is not what meaning the respective witnesses may attach to such phrase, but what was the intention and meaning of the General Assembly in using such phrase in the statute in question." *Far-*

*rand Coal*, 10 Ill. 2d at 510. One thing that should be abundantly clear to anyone who has read both the briefs and the decision in *Farrand Coal* is that, had Dr. Fajans' affidavit been part of the record in that case, it would not have made the slightest bit of difference to this court's decision. In *Farrand Coal*, this court did not *believe* that the legislature intended to speak so broadly as to include electricity within the definition of tangible personal property. But now that *Farrand Coal* explained that electricity is not tangible personal property, *we know for sure* that the legislature does not intend to include electricity when it uses the term "tangible personal property."

At oral argument, one of the justices asked the Department's attorney if the question before this court is a scientific one. The simple answer to that question is "no." If *Farrand Coal* would have settled the battle of experts and based its conclusion on who had the science of the issue correct, and if there was no evidence that the legislature had relied on that conclusion, and if the science had in fact changed since that time, then perhaps the question before this court would be a scientific one. But none of those things are true. Perhaps because the *Farrand Coal* court realized that this body is ill equipped to resolve disputes among physicists, it relied simply on what it believed the legislature intended when it used the term "tangible personal property." The question before this court is *not* a scientific one, but a legal one that this court is well equipped to answer: Should we presume that when the legislature enacted the tax credit in question it acted with knowledge of this court's long-standing determinations that electric utilities are not retailers of tangible personal property? That is the question before the court, and the majority never answers it.

Instead, the majority makes a scientific determination after having heard only one side of the argument.

Dr. Fajans stated that electricity is tangible as a matter of irrefutable scientific fact, but our cases show that scientists—even Nobel prize winners—dispute this fact every time the question is litigated. In this case, the Department asked for time to get its own expert if the question were determined to be a factual one, but the Department prevailed on its claim that this question has been decided by this court as a matter of law, and the Department can hardly be faulted for grounding its position in this court's precedents. If distinguished scientists cannot agree on this question, should the justices of this court not be leery of believing that they can solve the question by reading Teach Yourself Electricity and Electronics? Moreover, if the majority now wants to make this a factual issue, it oversimplifies the question when it determines that all we need to know is that electrons are matter—a fact that was not contested even in 1934. Also relevant is whether electrons are what is sold by the utility to the customer. In other words, are electric utilities retailers of electrons or of the work that electrons do? The argument was made in *Farrand Coal* that because the electrons flow from the utility to the customer and then back to the utility, the customer never purchases electrons from the utility. Rather, the customer is simply purchasing the work that electrons do—something that is unquestionably intangible. This conclusion is supported by the testimony of the expert witness in *Menagas*, who explained that "[w]hen the electrons are going out through the conductor they are charged with potential energy, but when forced through the resistance, such as an electric light bulb or a motor, the potential energy is taken out, and the electrons return to the generator possessing only kinetic energy." *Menagas*, 367 Ill. at 332. If there is anything in Dr. Fajans' affidavit that would call these conclusions into question and sug-

gest that the customer actually purchases electrons from the utility, the majority has not cited it.

Fifth, the majority also fails to comprehend the extent to which *Farrand Coal* was grounded in this court's precedents, particularly *Peoples Gas Light & Coke Co.*, which held that electric utilities are in the business of rendering a service and are not retailers of tangible personal property. The only significance the majority sees in *Peoples Gas Light & Coke Co.* is that the court deemed it unnecessary to determine whether electricity was tangible personal property. 234 Ill. 2d at 280. But the *reason* the court found it unnecessary to decide that question was that the court concluded that electric utilities were not retailers of *any* property, tangible or otherwise. Rather, they were engaged in a service business. See *Peoples Gas Light & Coke Co.*, 359 Ill. 2d at 154-61. The upshot is that we now have pronouncements from the Illinois Supreme Court that, for purposes of Illinois tax statutes using virtually identical definitions, electric utilities both *are* (*Exelon*) and *are not* (*Peoples Gas Light & Coke Co.*) retailers of tangible personal property.[11]

---

[11]On a side point, the majority refers to Dr. Fajans' affidavit and report as being "unrebutted." 234 Ill. 2d at 282. It is not clear whether, by using this term, the majority is giving credence to Exelon's claim that it is entitled to judgment in its favor because this affidavit was unrebutted. It should be pointed out that the Department argued that whether Exelon was involved in retailing was a question of law under the statute, and the Department requested time to obtain its own expert witness in the event that this was determined to be a question of fact. The ALJ agreed with the Department that, as a matter of law, Exelon was not engaged in retailing. It would have been apparent to anyone who understood this court's decisions in *Peoples Gas Light & Coke Co.* and *Farrand Coal* that there was no point in getting another expert affidavit on the tangibility of electricity. Since the Department prevailed on its point that this was a question of law, and since the Department could not possibly have anticipated either the indiffer-

Finally, as to the majority's statement that the discussion of the tangibility of electricity was "skewed by the true issue presented in that case" (234 Ill. 2d at 284), there was no one "true issue" in *Farrand Coal*. There were several distinct issues because the plaintiff's claim required it to prove several different things. The court discussed all of the issues, and its discussion of the tangibility of electricity was not "skewed" by anything. Quite the contrary, as thoroughly demonstrated above, it was solidly grounded in this court's precedents. This court had already held that electric utilities were in the business of rendering service, not retailing tangible personal property, and this court and the appellate court have consistently followed that precedent. In fact, the only "skewed" decision on this issue in the past 75 years is the present one, in which a majority of this court allowed its judgment to be skewed by an affidavit that merely rehashed points that have been made since the 1930s.

The majority trumpets as a benefit of its holding that Illinois will now be brought into line with California, Rhode Island, Alabama, and Florida, which have all held electricity to be tangible personal property in different contexts. 234 Ill. 2d at 284. But the majority never explains the relevance of this or what possible benefit will ensue. This is no more relevant or consequential than the fact that we have now created a conflict with Nebraska and New York, which have held electricity not to be tangible personal property. See *XO New York, Inc.*

ence this court would show to its own precedent or that this court would treat 100-year-old science as new, there is little relevance in Dr. Fajans' affidavit being unrebutted. Moreover, as to Exelon's point that the unrebutted affidavit requires this court to find that electricity is tangible, that would necessarily mean that if in the next tax case a party presents an unrebutted affidavit that electricity is intangible, this court would be forced to change its mind again.

*v. Commissioner of Taxation & Finance*, 856 N.Y.S.2d 310, 51 A.D.3d 1154 (2008); *Omaha Public Power District v. Nebraska Department of Revenue*, 248 Neb. 518, 537 N.W.2d 312 (1995). The important question is *not* what other states have held, but what our legislature intended when it used the phrase "tangible personal property" in this particular tax statute. Given this court's previous decisions, there can be no question.

## IV. CONCLUSION

I agree with my colleagues that the appellate court's decision should be affirmed, but I would do so for the reason that the appellate court's decision was correct as a matter of law. This court has consistently held that electric utilities are engaged in rendering service, not in retailing tangible personal property. The legislature has understood for decades that, for purposes of Illinois tax law, the term "tangible personal property" does not include electricity, and has acted accordingly. It is now the proper role of the judiciary to stay out. The majority has demonstrated a surprising indifference to this court's established precedent, first violating *Cates* by casting aside this court's discussion of an issue central to a plaintiff's claim and fully briefed by the parties as *obiter dicta,* and then overturning 75 years of consistent, established precedent on the basis of ancient science that predates that precedent. One senses in the majority opinion a sincere desire to demonstrate that the Illinois Supreme Court is on the cutting edge of the latest science. Unfortunately, the relevant science has not changed in the past 75 years, and there is no evidence that the legislature's intent has either.

Dissent Upon Denial of Rehearing

JUSTICE THOMAS, dissenting:
Although I commend the majority's decision to make

its opinion prospective only, that remedy falls far short of what is truly necessary in this case: allowing rehearing and addressing the Department's arguments. The grounds for allowing rehearing are points overlooked or misapprehended (see 210 Ill. 2d R. 367), and this opinion contains both.

The majority barely mentions the Department's arguments, and has essentially overlooked the Department's entire brief. Not only that, the majority completely misrepresents the Department's position. See 234 Ill. 2d at 284 ("The parties agree that if electricity is 'tangible personal property,' then Exelon would be engaged in 'retailing' as defined by section 201(e)"). The principal argument that the Department made on appeal—that given this court's precedents going back 75 years that electric utilities are not retailers of tangible personal property (see *Peoples Gas Light & Coke Co.*, 359 Ill. at 158-61), we must assume that the legislature did not intend for the tax credit in question to apply to electric utilities—is never addressed. This failure of the majority to do so is rendered even more puzzling by the reasons the majority gives for making its opinion prospective only. The majority concedes that the outcome of today's opinion was not clearly foreshadowed. 234 Ill. 2d at 286. Indeed, it was the opposite result that was clearly foreshadowed. The majority further states that *Farrand Coal* "suggested" in *"obiter dicta"* that electricity is intangible.[12] 234 Ill. 2d at 286. The majority also explains that prospective application will give the legislature a chance to comport with this court's new definition, while avoiding the uncertainty in other areas of tax law that would result from retroactive application. 234 Ill. 2d at 286. Is this not a clear acknowledgment that the legisla-

---

[12]This is wrong twice. First, it was not a suggestion. Second, it was not *dicta*, let alone *obiter dicta*.

ture did *not* intend for the tax credit to include electric utilities when it originally enacted it? And, if the majority concedes that "[t]he fundamental rule of statutory construction is to give effect to the intention of the legislature" (234 Ill. 2d at 274), why not simply hold that the tax credit is not available to electric utilities? I would allow rehearing, address the Department's arguments, apply this court's well-established precedent, and hold that the tax credit is not available to electric utilities. Below is a summary of the key problems with the majority opinion that demand some sort of corrective action.

### I. *Obiter Dicta*: The Majority Opinion Is Wrong on the Merits

The Department correctly points out that this court's determination that *Farrand Coal*'s discussion of the tangibility of electricity was *obiter dicta* is demonstrably false. As the Department notes, an essential element of the plaintiff's claim in *Farrand Coal* was demonstrating that its product was resold by the purchaser as tangible personal property. Accordingly, the plaintiff could not succeed without demonstrating that electric utilities sell tangible personal property. Thus, the discussion of this issue could not be *obiter dicta*. Moreover, in the section of the opinion that the majority *acknowledges is the court's holding*, this court stated quite clearly and explicitly that the sale of electrical energy by a utility is *not* a sale of tangible personal property. *Farrand Coal*, 10 Ill. 2d at 513. How much more clearly could the court have said it? Moreover, if the court *expressly held* that energy is intangible (*Farrand Coal*, 10 Ill. 2d at 511), how can the majority possibly conclude that it is an issue of first impression whether *electrical energy* is intangible? Exelon's counsel conceded in its written argument in support of summary judgment that the holding that energy is intangible necessarily includes electricity:

"The court in *Farrand Coal Co.* found that *electricity* was not 'tangible' in the ordinary sense of the word because, apart from its connection with mass and matter, 'energy' cannot be stored, weighed, transported, or touched, and it thus not otherwise perceptible by the senses." (Emphasis added.)

Does the majority really expect anyone to believe that when this court stated that energy is intangible and that electric utilities are not retailers of tangible personal property it was merely making offhand comments (for who knows what reason) instead of addressing and rejecting the key component of the plaintiff's claim? Moreover, the majority does not believe its own opinion. The majority states that *Farrand Coal* was based on our scientific understanding of over a half century ago, but that our current understanding of electricity has progressed beyond that time.[13] If this is an issue of first impression (234 Ill. 2d at 286), what has our understanding of electricity progressed beyond?

The Department makes a couple of additional points that should be noted. First, the Department points out that the relevant precedent from this court has already been described as a holding. In *Waukegan School District*, this court explained that "[t]his court *held* in *Peoples Gas Light & Coke Co. v. Ames* (1934), 359 Ill. 152, that the retailers' occupation tax did not apply to public utilities because *those corporations are not in the business of selling tangible personal property*, but are in the business of providing a public utility service. (See also *Farrand Coal v. Halpin* (1957), 10 Ill. 2d 507 ***.)" (Emphases added.) *Waukegan School District*, 95 Ill. 2d at 252-53.[14]

---

[13]It should be noted that *Farrand Coal* was decided five years after the United States had detonated a hydrogen bomb. The majority gives no support at all for its claim that the properties of electricity were a mystery in 1957.

[14]As the Department notes, the continued validity of *Wauke-*

Second, the appellate court read *Farrand Coal* the same way. In *Union Coal Co.*, the appellate court stated that "[i]n the *Farrand* case the court *held* an electric utility company does not sell tangible personal property when it sells electricity or electrical energy." (Emphasis added.) *Union Coal Co.*, 38 Ill. App. 3d at 294. Third, the Department points out that the meaning of *Farrand Coal* was so well established that *even Exelon's counsel* several times at the administrative and circuit court levels described *Farrand Coal* as holding that electricity is not tangible personal property. The record is replete with such examples. It was only after Exelon's repeated attempts to distinguish *Farrand Coal* failed that Exelon changed its position on appeal and made a *dicta* argument—an argument that should have been summarily rejected.

When this court can characterize as *obiter dicta* a discussion that has been uniformly recognized as a holding and that addresses a key component of one of the

gan *School District* is now also in doubt. In that case, this court held that a tax that applied to "persons engaged in the business of distributing supplying, furnishing, or selling electricity for use or consumption" was an impermissible tax on the sale of services. *Waukegan School District*, 95 Ill. 2d at 252-54. The taxing authority tried to argue that it was taxing the "product" sold by the utility, but this court, relying on *Farrand Coal* and *Peoples Gas Light & Coke Co.*, rejected that argument on the basis that utilities render a service and are not retailers of tangible personal property. This court explained that the term "service" under Illinois tax law means "all 'sales' transactions *other than sales of tangible personal property.*" (Emphasis added.) *Waukegan School District*, 95 Ill. 2d at 254. Therefore, Commonwealth Edison's sale of electricity to its customers was provided as part of a service and was not a sale of tangible personal property. *Waukegan School District*, 95 Ill. 2d at 253-54. If electric utilities are now retailers of tangible personal property (234 Ill. 2d at 284-85), then *Waukegan School District* is now of the same dubious validity as *Peoples Gas Light & Coke Co.* and *Farrand Coal*.

parties' claims, it shows that this court will characterize *anything* as *obiter dicta*, thus avoiding *stare decisis* considerations. This court cannot expect the bench and bar to afford our opinions a level of deference and respect that we are unwilling to give ourselves.

Much more importantly, however, let us assume for a moment that the majority is correct and that all relevant portions of *Farrand Coal* were mere *obiter dicta*. This in no way justifies the majority's refusal to consider the legislature's intent in using the phrase "tangible personal property" in the statute in question. An unstated fallacy in the majority opinion is that the rules of *dicta* apply to the legislature. If we are willing to concede that they do not, then it is obvious that we must consider whether the legislature would have relied on *Farrand Coal* and the decisions interpreting it. As I have already demonstrated above, until the majority's opinion in this case, there appeared to be universal agreement about what *Farrand Coal* said. Given that, it is safe to assume that the legislature acted with the same belief. Further, there was appellate court authority describing this portion of *Farrand Coal* as a holding. See *Union Coal Co.*, 38 Ill. App. 3d at 294.

Taking things a step further, what if the *Farrand Coal* opinion did not even exist? The majority's opinion would still be directly contrary to *Peoples Gas Light & Coke Co.* This court established in that case that utilities are *not* retailers of tangible personal property, but are engaged in a service business. *Peoples Gas Light & Coke Co.*, 359 Ill. at 154-58. That case involved whether gas and electric utilities could be taxed under the Retailers' Occupation Tax Act, which was a tax upon retailers of tangible personal property. As in this case, the parties introduced scientific evidence concerning whether what they sold was tangible. This court concluded that it did not have to reach that issue, because the legislature

treats utilities and retailers differently and that a tax imposed on retailers could not be imposed on utilities. The court held that, for tax purposes, utilities are engaged in a service business and are not retailers. Commonwealth Edison was involved in that case, too, and it and the other utilities convinced this court to adopt this position. We agreed with Commonwealth Edison and the other utilities that *"their occupation constitutes a peculiar class of business enterprise entirely distinct and separate from the business of the retailer or retail merchant."* (Emphasis added.) *Peoples Gas Light & Coke Co.*, 359 Ill. at 155. This court held that the language of the public utilities act clearly showed that the legislature regards utilities as engaged in service. *Peoples Gas Light & Coke Co.*, 359 Ill. at 155. We further explained that the legislature could not have intended the Retailers' Occupation Tax Act to apply to utilities because "the act plainly refers to those engaged in the business of selling tangible personal property for use or consumption." *Peoples Gas Light & Coke Co.*, 359 Ill. at 158. This point bears repeating: *this court specifically held that the legislature could not have intended a statute to apply to public utilities if it referred to "those engaged in the business of selling tangible personal property."* In this case, we are faced with a tax credit that the legislature reserved for those engaged in the business of selling tangible personal property. Even if *Farrand Coal* had never existed, Exelon's arguments should be rejected, and they should be rejected because of the very law that Exelon's predecessor helped to bring about.

Even if this court now wants to say that all relevant parts of *Farrand Coal* were *obiter dicta*, that does not mean that we do not have to consider whether the legislature would have acted in reliance on that opinion, or on any of the opinions interpreting it, or on any of the

opinions that preceded it. Similarly, does the majority really believe that the legislature would have concerned itself with whether *Menagas*'s statement that electricity is intangible was merely an "assumption" and that assumptions do not constitute holdings (234 Ill. 2d at 281)? The majority seems to be coming around to these points. It already acknowledged in the opinion that "it was reasonable for the appellate court to consider itself bound by this court's discussion of the tangibility of electricity in *Farrand Coal.*" 234 Ill. 2d at 282. Moreover, in the new section of the opinion making this decision prospective only, the court explains that its holding was not clearly foreseen and that it wants to give the legislature a chance to comply with its holding. 234 Ill. 2d at 285. Thus, the majority has clearly acknowledged the strong possibility (if not certainty) that the legislature relied on this court's and the appellate court's previous opinions. No justification exists for the majority's refusal to address the Department's arguments.

## II. A Legal Question Becomes a Factual Question: The Majority's Remedy Is Wrong

Another reason that rehearing (or at least a more extensive modification to the majority opinion) is necessary is to clarify this court's holding to ward off the inevitable confusion that will follow. The majority begins its analysis by stating that "this case presents solely questions of law." 234 Ill. 2d at 273. If the majority had addressed the true question in this case—whether we presume that when the legislature enacted the tax credit in question it acted with knowledge of this court's longstanding determinations that electric utilities are not retailers of tangible personal property—then the question would be a legal one. But the majority never addresses that issue, choosing instead to answer a *factual* question: whether, as a matter of scientific fact, electric-

ity is tangible.[15] The court then relies on the fact that the record contains the unrebutted affidavit of Dr. Fajans that electricity is tangible. 234 Ill. 2d at 282. Clearly, the majority is resolving a factual question, not a legal one.

The Department argues in its petition for rehearing that if this court now wants to make this a factual question instead of a legal one, then it should remand for further proceedings. The basis for the Department's summary judgment motion was that whether an electric utility is a "retailer" under the statute is a question of law and that the physical properties of electricity were not material to that issue. The Department explained that whether Dr. Fajans believed that electricity was tangible as a matter of science was irrelevant, because the issue had already been decided as a matter of law. Exelon

---

[15]The greatest misunderstanding in the majority opinion, which taints everything, is its belief that the question before the court is scientific. This was simply a nonissue introduced into the case by Exelon that this court unfortunately made the centerpiece of its opinion. The Department put it best in its reply to Exelon's response to its summary judgment motion when it wrote:

"The fact that Taxpayer's expert, Professor Fajans, believes that electricity is tangible as a matter of science, however, is of no legal consequence. The issue of whether electricity is tangible for purposes of this tax credit, is not a question of science or even fact, but what the General Assembly intended to include under the phrase 'tangible personal property.' From the *Farrand* decision we know that within the framework of its ordinary and popular meaning, 'tangible personal property' does not include electricity. Accordingly, *a scientist can shed no light, or be of any assistance, to this Tribunal in understanding whether the legislature meant to include electricity within 'tangible personal property.'* This question can only be addressed by a court as a question of law through means of statutory interpretation, which the Illinois Supreme Court has already done." (Emphasis added.)

argued that whether electricity was tangible was an essential *factual* question that needed to be resolved, and at one point *even conceded that its summary judgment motion should be denied because whether electricity or electrons are tangible personal property was a material fact question that precluded summary judgment.* As I noted in my special concurrence, the Department grounded its summary judgment motion in this court's precedents resolving the question as a matter of law, but asked for time to obtain its own expert in the event that the relevant questions were determined to be factual. The Department prevailed on its argument that this was a question of law at the administrative level, the circuit court level, and the appellate court level. Thus, there was never a reason for the Department to submit testimony on this issue. If this court agrees with Exelon that the issue that must be resolved is one of scientific fact, then it should also agree with the position that Exelon took below: that the existence of this material fact question precludes summary judgment in Exelon's favor.

This court completely misrepresented the Department's position in its original opinion when it stated that "[t]he parties agree that if electricity is 'tangible personal property,' then Exelon would be engaged in 'retailing' as defined by section 201(e)." 234 Ill. 2d at 284. This was never the Department's argument, and this point alone mandates that we grant rehearing.[16] The Department's

---

[16]Even if the Department had made this argument, the majority would be required to reject it under *Peoples Gas Light & Coke Co.* If the scientific evidence in *that case* was held to be irrelevant to the question of whether an electric utility is a retailer, then it should also be found to be irrelevant in *this case*. We are not bound by a party's incorrect framing of the issue. (Of course, the Department did not incorrectly frame the issue, the majority did. For a summary of what the Department actually argued, quoted directly from the Department's brief, see my special concurrence to the

position was that whether an electric utility is a "retailer" under the statute is a question of law and that the physical properties of electricity were not material to that issue. The Department correctly argues that now that this court has changed a legal question into a factual one, the cause should be remanded so that the Department may contest the material facts. All relevant facts and scientific opinions should be considered. Instead, the majority simply shuts down the fact-finding process after hearing only one side of one part of the argument. This is profoundly unfair to the Department.

The Department correctly argues that, if this is a factual question, then several important issues need to be resolved. First, relying on my special concurrence, the Department argues that, even if electrons are material, that does not make an electric utility a retailer of tangible personal property. As I explained before, expert testimony considered in our previous cases shows that electrons flow from the utility to the customer and then back to the utility, so that the customer never takes possession of electrons. The customer is simply purchasing the work that electrons do—an unquestioned intangible. I stated previously that, "[i]f there is anything in Dr. Fajans' affidavit that would call these conclusions into question and suggest that the customer actually purchases electrons from the utility, the majority has not cited it." 234 Ill. 2d at 319-20 (Thomas, J., specially concurring). Not only does Dr. Fajans' report not contradict this point, it fully supports it. In Dr. Fajans' report, he explains that electrons flow from the power source to the load along one wire, and then back from the load to the power source. The report even includes a diagram showing the electrons flowing from the power source to the load and

majority opinion (234 Ill. 2d at 303-04 (Thomas, J., specially concurring)).)

then back to the power source. In other words, and this point cannot be overstated, *even within the four corners of Dr. Fajans' report, a legitimate question exists whether an electric utility can be considered a retailer of tangible personal property.*

Indeed, the State Board of Equalization of California (the Board) relied on this aspect of Dr. Fajans' report to conclude that the sale of electricity was the sale of a service rather than a sale of tangible personal property. In *In re Appeal of PacifiCorp*, 2002 WL 31153476 (September 12, 2002), the Board considered whether the sale of electricity was the sale of tangible personal property. The respondent in that case relied on Dr. Fajans' report to argue that electricity is tangible personal property. The Board concluded that Dr. Fajans' report instead led to the conclusion that the sale of electricity is the sale of a service. The Board noted that the Ohio Supreme Court held in *Otte v. Dayton Power & Light Co.*, 37 Ohio St. 3d 33, 36, 523 N.E.2d 835, 838 (1988), that electricity is a service rather than a product:

"A 'product' is anything made by human industry or art. Electricity appears to fall outside this definition. This is so because electricity is the flow of electrically charged particles along a conductor. DP&L does not manufacture electrically charged particles, but rather, sets in motion the necessary elements that allow the flow of electricity."

The Board found Dr. Fajans' report to be consistent with *Otte*:

"Although Professor Fajans's discussion of electricity in his report seems intended to support respondent's position that electricity is 'tangible personal property' by emphasizing the 'physical and material' nature of electrons, his discussion is also consistent with the definition of electricity in *Otte* as a 'flow of electrically charged particles along a conductor.' In addition, Professor Fajans's discussion of electricity is also consistent with the conclusion of the court in *Otte* that the 'distribution system' with respect to

electricity there was a service. In our view, just as the 'distribution system' by which the flow of electrically charged particles occurred in *Otte* was a service, appellant's generation and transmission of electricity were also services under section 25136."

The Board summed up by concluding that, "for purposes of California tax law, electricity is intangible."[17]

Thus, Dr. Fajans' affidavit and report are no justification for shutting down the fact-finding process. Important questions need to be resolved, and concluding that an electron is material is simply the beginning, not the end, of the inquiry. As *In re Appeal of PacifiCorp* shows, one possible conclusion that can be taken from Dr. Fajans' report is not the majority's view that this court was hopelessly out of touch with science in 1957 when it decided *Farrand Coal*, but rather that this court was ahead of the game in 1935 when it held in *Peoples Gas Light & Coke Co.* that the sale of electricity is the sale of a service rather than the sale of tangible personal property.

Other factual questions that the Department argues need to be resolved now that this court has changed the inquiry to one of fact are: (1) whether, when the Investment Tax Credit was enacted in 1981, "humanity" (234 Ill. 2d at 282) (and, by necessary extension, the General Assembly) considered electricity to be tangible personal property; and (2) whether, even if the transmission of electricity is the sale of tangible personal property, Exelon was "primarily engaged in *** retailing" within

---

[17]This is an unpublished decision that is designated "not to be cited as precedent." I discuss it here only to show that more than one legitimate conclusion can be drawn from Dr. Fajans' report. Further, in the California case cited by the majority, *Searles Valley Minerals Operations, Inc. v. State Board of Equalization*, 160 Cal. App. 4th 514, 72 Cal. Rptr. 3d 857 (2008), the California appellate court itself cited and discussed *In re Appeal of PacifiCorp* and distinguished it instead of dismissing it as nonprecedential.

the meaning of the Investment Tax Credit, or was instead primarily engaged in the production, purchase, transmission, and distribution of electricity.[18] Both points are well-taken, and these questions need to be resolved. Clearly the Department is correct that a remand is the appropriate course of action following the majority's decision to transform the relevant inquiry into one of fact.

III. Failure to Completely Dispose of the Appeal

Now that the court has made its opinion purely prospective—applying only to tax year 2009 and after—and has affirmed the judgment of the appellate court, its previous reasons for not addressing Exelon's uniformity clause argument are no longer valid. Exelon sought the tax credit for tax years 1995 and 1996 under two theories: (1) it is entitled to it as a matter of statutory construction; and (2) the Department's failure to grant it the tax credit violated the uniformity clause of the Illinois Constitution. Explaining why it is not reaching the second issue, the court states that, "[a]s the Department correctly observed in its motion for summary judgment and at oral argument before this court, if Exelon qualifies for the section 201(e) tax credit as a matter of statutory construction, then there is no reason to reach the alternative constitutional issue." 234 Ill. 2d at 274. The court later explains that constitutional issues are only reached when the matter may be resolved on nonconstitutional grounds, and states that the court's "disposition of this cause obviates the need to determine whether the

---

[18]The majority's implied conclusion that this question does not need to be answered is curious, given the majority's citation to L. Hyman, A. Hyman & R. Hyman, America's Electric Utilities: Past, Present and Future 89 (7th ed. 2000), for the proposition that electric utilities must "perform the following functions to deliver the product: production, marketing, transmission, distribution, metering and billing, and retail supply." 234 Ill. 2d at 281.

Department violated the uniformity clause of the Illinois Constitution." 234 Ill. 2d at 286. It goes without saying that the court's decision to change its judgment from a reversal to an affirmance mandates that we now address Exelon's other issue. This appeal involves Exelon's claim for tax years 1995 and 1996, over a decade before the effective date of the majority's holding that electric utilities are retailers of tangible personal property. Thus, the majority affirms the appellate court's judgment denying Exelon the credit. How can this court possibly *deny* Exelon the credit on the first issue and then refuse to address Exelon's second argument on the basis that Exelon's *qualification* for the credit on the first issue obviates the need to address Exelon's second argument? Given the court's revisions on denial of rehearing, Exelon is entitled to be heard on its uniformity clause argument.

IV. Conclusion

In sum, rehearing should be granted, and this court should at long last address the Department's arguments. There was an obvious outcome in this case, and this court should apply its long-standing precedent that electric utilities are engaged in a service business and are not retailers of tangible personal property. No legitimate reason exists to fundamentally alter the tax treatment of electric utilities after all this time. This court's precedents are now that electric utilities are not engaged in retailing (*Peoples Gas Light & Coke Co.*) and are primarily engaged in retailing (*Exelon*). The majority's failure to explain how this can be so ensures no end of headaches not only for the Department and the legislature, but also this court, which will likely spend years considering questions thought put to rest decades ago. If the majority is unwilling to acknowledge and address the Department's arguments, it should remand for further fact-finding. It

is also mandatory that the court now address Exelon's uniformity clause argument.

For all of the above reasons, I cannot join the majority's decision to deny rehearing.